UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

:

RICHARD HEIDEN, M.D.,                                        :

:

Plaintiff,              :

:

:               20-cv-10288 (LJL)

-v-                                      :

:               OPINION AND ORDER

NEW YORK CITY HEALTH AND HOSPITALS             :

CORPORATION, PHYSICIAN AFFILIATE GROUP         :

OF NEW YORK, P.C., and ALAN KANTOR, M.D.,      :

:

Defendants.             :

:

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/11/2023__

LEWIS J. LIMAN, United States District Judge:

Plaintiff Richard Heiden, M.D. ("Heiden" or "Plaintiff") brings this action alleging

claims of disability discrimination and retaliation against Defendants New York City Health and

Hospitals Corporation ("H+H"), the Physician Affiliate Group of New York, P.C. ("PAGNY"),

and Alan Kantor, M.D. ("Kantor," and together with H+H and PAGNY, "Defendants"), in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law. § 290 *et seq.*, and the New York

City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  Dkt. No. 1.

Defendants move for summary judgment on all claims.  Dkt. No. 58.  Defendants also move to

strike portions of Plaintiff's Rule 56.1 Statements of Fact.  Dkt. No. 88.  For the following

reasons, the motion to strike is denied and the motion for summary judgment is granted in part

and denied in part.[1]  The Court grants summary judgment on the ADA and NYSHRL

---

[1] Defendants move to seal "three documents created by H+H facilities for the purpose of
analyzing two different patient medical events."  Dkt. No. 62 at 2.  Those documents contain
information protected under New York Education Law § 6527(3) and New York Public Health

discrimination and retaliation claims and denies summary judgment on the NYCHRL

discrimination and retaliation claims and the ADA, NYSHRL, and NYCHRL failure-to-

accommodate claims.

## BACKGROUND

The following facts are drawn from the parties' statements of material facts submitted

pursuant to Local Rule 56.1 and the evidence submitted in connection with the motion.  Dkt.

---

Laws § 2805-j and § 2805-m.  They contain information related to patient care.  The motion to seal is granted.  The documents are judicial documents deserving of the highest weight of the presumption of access because they were submitted in support of Defendants' motion for summary judgment.  *See Lohnn v. Int'l Bus. Machines Corp.*, 2022 WL 36420, at *6 (S.D.N.Y. Jan. 4, 2022) ("[D]ocuments submitted in connection with a summary judgment motion, as to which a party seeks entry of judgment in its favor, 'are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment.'" (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006))).  The Court, however, agrees that the documents were a product of a state-mandated quality assurance program intended to ensure public safety.  They were "generated to insure and improve the quality of care to patients," *Strini v. Edwards Lifesciences Corp.*, 2006 WL 3751338, at *2 (N.D.N.Y. Dec. 19, 2006), and have been held to be "protected from compelled disclosure by the Public Health and Education Laws even in the absence of a formal claim of medical malpractice," *id.*  New York courts have recognized the importance of these statutes and materials.  *See generally Logue v. Velez*, 699 N.E.2d 365 (N.Y. 1998) (describing the legislative history and public policy of the statues); *see also Pal v. New York Univ.*, 2010 WL 2158283, at *1 (S.D.N.Y. May 27, 2010) (sealing the document produced under those statutes in entirety when related to patient care); *Mehulic v. New York Downtown Hosp.*, 39 N.Y.S.3d 138, 139 (1st Dep't 2016) (stating that "the statutes are intended to encourage candid performance reviews without fear of legal reprisal" and granting sealing motion); *Bernholc v. Kitain*, 741 N.Y.S.2d 736 (2d Dep't 2002) (rejecting an argument in New York Supreme Court that confidentiality does not apply when the documents involve the parties subject to review).  Sealing the documents would "protect the individuals involved" and "support the 'candor' in discussions" of medical events without overly limiting public access to the materials.  Dkt. No. 62 at 2l; *cf. McChesney v. Hogan*, 2012 WL 3686083, at *19 (N.D.N.Y. July 30, 2012), *report and recommendation adopted*, 2012 WL 3655467 (N.D.N.Y. Aug. 24, 2012) (sealing program materials "due to the potential detrimental effect that disclosure of the materials to convicted sex offenders may have on the SOTP program goal to rehabilitate them").

Nos. 64, 72.  The facts are undisputed unless otherwise indicated.  The record is construed in

favor of the non-moving party.[2]

_____

[2] Defendants move to strike numerous paragraphs of Plaintiff's Response to Defendants' 56.1 Statement and Additional Statement of Facts.  Dkt. No. 89.  In particular, Defendants contend that Plaintiff's Response contains improper legal argument and unsubstantiated assertions, and that Plaintiff's Additional Statement should be similarly stricken because the facts are irrelevant, immaterial, duplicative, unsupported, and/or based on inadmissible evidence.  *Id.*  Finally, they request seven days from the Court's decision to respond to the paragraphs of Plaintiff's Additional Statement that remain.  *Id.* at 12.  Plaintiff contends that Rule 56 does not allow for a motion to strike, that Defendants improperly submit new arguments and evidence through their motion to strike, and that his Response and Additional Statement are otherwise proper.  Dkt. No. 91.  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). "Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative or do not cite to supporting evidence."  *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).  "A party seeking to strike a Rule 56.1 statement bears a heavy burden, as courts generally disfavor motions to strike."  *Christians of California, Inc. v. Clive Christian New York, LLP*, 2014 WL 3407108, at *2 (S.D.N.Y. July 7, 2014).  "Courts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions."  *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012), *report and recommendation adopted in part*, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013).  To the extent that Plaintiff has made assertions that are improper—*e.g.*, if they lack support in admissible evidence, advance improper legal argument or conclusory assertions, or are otherwise immaterial—the Court will disregard such statements. *See Christians of California, Inc.*, 2014 WL 3407108, at *2 ("To the extent defendants' statement contains any improper argument, the Court does not find that its inclusion (or defendants' Rule 56.1 statement as a whole) comes close to contravening the requirements or purposes of Rule 56.1 such that it should be struck."); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 2011 WL 3586060, at *4 (S.D.N.Y. July 29, 2011), *vacated and remanded on other grounds*, 715 F.3d 102 ("Although many of Mihalik's assertions in her Counter-Statement and Affidavit are improper, the Court declines to engage in the time-consuming task of formally striking each statement at issue.  Instead, following the practice of several other courts in the district, this Court will disregard any statements that lack support or are otherwise inadmissible."); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 255 (S.D.N.Y. 2009) ("I will disregard any materials contained in the affidavits or Local Rule 56.1 Counterstatement that I find to be improper under the Federal Rules, if any, and Defendant's motion to strike such materials is denied.").  Defendants will not be granted an additional seven days from the Court's decision to dispute Plaintiff's Additional Statement of Facts.  Defendants do not provide any compelling reason as to why they did not timely respond to the paragraphs within the Additional Statement.  Defendants could have done so concurrently with their motion to strike.  Moreover,

Heiden is a licensed radiologist who was employed by the Lincoln Medical and Mental Health Center ("Lincoln") and PAGNY and assigned to work at Lincoln.  Dkt. No. 72 ¶¶ 1, 257. He specializes in diagnostic radiology.  *Id*. ¶ 217.  PAGNY is a professional services corporation organized and existing under the laws of the State of New York.  *Id*. ¶ 4.  PAGNY, through an affiliation agreement with H+H, provides clinical staff and physicians at public health facilities operated by H+H, including Lincoln.  *Id*.  H+H operates Lincoln and has "supervisory authority" over and the ability to "hire and fire" PAGNY employees.  *Id*. ¶¶ 5, 259.  Defendant Kantor, since 2016 and at all relevant times, held the position of Chair of Radiology at Lincoln.  *Id*. ¶ 6.

## I.      Heiden's Professional Background

### A.      Heiden's Qualifications and Work History

Heiden received his medical degree from SUNY Downstate College of Medicine in 1983. He is licensed to practice medicine in New York State and at all relevant times, his license was up to date and in good standing.  *Id*. ¶¶ 215–16.  He completed a three-year residency training in diagnostic radiology at Bronx Lebanon Hospital Center and a one-year residence in the same at Harlem Hospital Center.  *Id*. ¶¶ 218–19.  He also completed a one-year fellowship in cross-sectional imaging at State University of New York Stony Brook.  *Id*. ¶ 220.  From 2002 to 2012, he served in a variety of roles at the Interfaith Medical Center, Brookdale University Hospital, and Mary Immaculate Hospital, ranging from an attending physician to the Chairman of Radiology.  *Id*. ¶¶ 221–25.  From 2004 to 2005, he also taught as an Assistant Professor in the Department of Radiology at SUNY Downstate College of Medicine while working at the

---

Defendants were granted their requested extension to reply to Plaintiff's opposition to summary judgment. Dkt. No. 82.  Therefore, Defendants' motion to strike is denied.  The Court will instead exercise its discretion to disregard improper statements in Plaintiff's Response or Additional Statement.  If there are additional arguments or evidence improperly asserted in Defendants' motion to strike, those arguments will be disregarded as well.

Interfaith Medical Center.  *Id*. ¶ 222; Dkt. No. 69-31 (Heiden's curriculum vitae).  Heiden has

operated his own independent radiology practice for over twenty years, served as an expert

witness in approximately thirty cases, and written approximately fifteen scholarly articles.  Dkt.

No. 72 ¶¶ 230–32.

Heiden, from approximately 2000 to 2012, worked as an independent medical expert

("IME") for various insurance companies.  *Id*. ¶ 11.  In or about 2010, New York's Office of

Professional Medical Conduct ("OPMC") began investigating a claim that in 2009, Heiden had

"overread" magnetic resonance images ("MRIs") as for no-fault insurance claims.  *Id.* ¶ 12.  The

concern was that this would result in inflated payouts for patients whom Heiden diagnosed as

having conditions that the patients did not have.  *Id*. ¶ 13.  Heiden disputes that he overread any

such MRIs.  *Id.* ¶ 12.  Heiden ceased working as an IME in December 2012, although the parties

dispute whether it was the result of any "ultimate determination" by OPMC or that he was forced

to do so.  *Id*. ¶ 14.  Heiden was interviewed by OPMC in connection with the investigation and,

from April 16, 2014 to May 1, 2016, practiced under New York State Professional Medical

Conduct Board Order 14-86, a Nondisciplinary Order of Conditions.  *Id*. ¶ 15.  Pursuant to that

order, his work was reviewed and credibility assessed.  *Id*. ¶ 16.

From in or about October 2012 through July 29, 2020, Heiden worked at PAGNY as a

sessional, or part-time, assistant attending physician in the Radiology Department at the Coney

Island Hospital ("CIH").  *Id*. ¶ 17.  At CIH, Heiden practiced "diagnostic radiology," which

included "reading or interpreting X-rays and sectional images (*e.g.* CT or CAT scans)," but not

"ultrasound images."  *Id*. ¶ 21.  He was supervised by Dr. Yashwant Patel ("Patel"), who held the

position of Vice Chairperson of Radiology from 2013 to 2019 and Interim Chairperson of

Radiology from 2019 to August 2021.  *Id*. ¶¶ 19–20.

In December 2018, while at CIH, Heiden missed a diagnosis of lung cancer that delayed diagnosis and treatment for the patient. *Id.* ¶¶ 23–25. As a result, in or about April 2019, CIH initiated a Root Cause Analysis ("RCA"). *Id.* ¶ 26. An RCA is a process used to retrospectively study events where patient harm occurred in order to identify and address the root cause or causes of harm and prevent similar events from happening in the future. *Id.* ¶ 27. It is not a disciplinary action. *Id.* ¶¶ 28, 310. As a part of a plan of correction for the missed diagnosis, Heiden reviewed the case and was counseled by the Chair of Radiography on chest radiograph interpretation, completed continuing medical education credits related to chest radiography, and reviewed literature on missed lung cancers. *Id.* ¶¶ 29–35. He underwent a Focused Professional Practice Evaluation ("FPPE") beginning in April 2019. *Id.* ¶ 30. An FPPE is an intensive review of an expansive selection of cases handled by the subject physician. The cases are reviewed by a panel of peer specialists for the purpose of determining whether the physician demonstrates an appropriate level of professional capability. *Id.* ¶ 31. The result of the FPPE was "satisfactory" and found that "no further action [was] necessary" and that he was "competent to perform." *Id.* ¶¶ 34–35, 229. When he left CIH, he was in "good standing." *Id.* ¶¶ 24, 228–29.

### B.     Heiden's Application to Lincoln

In 2019, Heiden applied for the position of attending physician at Lincoln's Department of Radiology. *Id.* ¶ 233. As a part of the application, Patel completed a practitioner performance questionnaire and recommended that Heiden receive all appointments and credentials that Heiden was seeking related to employment at Lincoln. *Id.* ¶ 242. Patel indicated that Heiden was "never considered for disciplinary action," never had his "status or authority to provide services . . . revoked, suspended, restricted, [or] not renewed," and was never placed on "probationary status or reprimanded." *Id.* ¶ 243. Two of Heiden's colleagues at CIH also

completed peer reference evaluations that were submitted to Lincoln, which included twenty-four ratings of "outstanding," eight ratings of "satisfactory," and zero ratings of "unsatisfactory." *Id*. ¶ 244. Those evaluations concluded that Heiden could perform the clinical privileges in a manner "consistent with the requirements for the safety of patients and the public." *Id*. ¶ 246.

During the application process, Heiden was interviewed by a three-person committee at Lincoln which included Kantor, the Chair of the Radiology Department at Lincoln. *Id*. ¶¶ 44, 234–35. Kantor was one of the decisionmakers involved in the decision to offer Heiden employment at Lincoln. *Id*. ¶¶ 44, 236. Kantor, as the primary person responsible for granting privileges in Lincoln's Radiology Department, recommended Heiden for appointment after reviewing his application materials in August and September 2019. *Id*. ¶¶ 249–52. During his eventual employment at Lincoln, Heiden reported to Kantor. *Id*. ¶¶ 43, 258.

On July 10, 2019, PAGNY offered Heiden the role of attending physician. *Id.* ¶ 237. In or about August 2019, Heiden ceased sessional work at CIH prior to working full-time at Lincoln. *Id*. ¶ 18. Heiden received all of the required recommendations by September 26, 2019. *Id.* ¶ 253. On or about October 1, 2019, Heiden was appointed on a provisional basis to the medical staff at Lincoln in the position of attending physician in the Radiology Department for the period from September 26, 2019 to June 30, 2021. *Id*. ¶ 36.

## II. Heiden's Focused Professional Practice Evaluation ("FPPE")

All medical staff members appointed to Lincoln are "subject to an initial provisional period" and "upon satisfactory conclusion of that period . . . , may complete their initial 2 year cycle as determined by the Medical Staff Bylaws, Rules, and Regulations." *Id*. ¶ 40. Furthermore, all newly-appointed medical staff members at Lincoln are subject to an initial FPPE within the first six months of appointment. *Id*. ¶ 68. After the initial FPPE, a subsequent FPPE of a medical staff member's performance can be triggered by a "significant patient event"

or an "issue that arises that may affect patient safety." *Id*. ¶¶ 68–69.  An FPPE that results from

an RCA is more focused than the initial FPPE or an ongoing professional practice evaluation

("OPPE"), *id*. ¶ 70, which is conducted every six months for certain credentialed medical

practitioners, *id*. ¶ 72.

### A.   December 2019 Brain Hemorrhage Undercall

In December 2019, one of Heiden's diagnostic interpretations became subject to an RCA.

*Id*. ¶ 45.  At Lincoln, the RCA process is generally initiated when an incident or occurrence

involving patient harm is reported to Lincoln's risk management department.  *Id*. ¶ 46.  The

December 2019 RCA involved a patient who arrived on December 10, 2019, at Lincoln's

emergency room experiencing symptoms of headache, nausea, vomiting, and diarrhea.  *Id*. ¶ 47.

Heiden reviewed the patient's computed tomography ("CT") scan and concluded that the scan

was normal.  The patient was diagnosed with a "viral syndrome" and was given intravenous

("IV") fluids.  *Id*. ¶ 49.  The patient's symptoms continued and in the early morning of December

13, 2019, the patient was found on the floor of his hospital room in an agitated state.  The patient

reported that he had fallen and hit his head.  *Id*. ¶ 49.  The patient underwent a second CT scan,

which was reviewed by a different radiologist, who found that the CT scan revealed that the

patient had a brain hemorrhage.  *Id*. ¶¶ 50–51.  A neurosurgery team reviewed both CT scans and

determined that the first CT scan reviewed by Heiden revealed evidence of a brain hemorrhage

that had worsened by the time the second CT scan was taken.  *Id*. ¶ 52.  Heiden's misread had

delayed the patient's proper course of treatment for approximately 24 hours.  *Id*. ¶ 53.  Kantor

learned of the incident the day after it happened.  *Id*. ¶ 54.

The RCA committee that reviewed the patient's case consisted of ten members of

Lincoln's staff, including Kantor, Lincoln's Interim Chief Medical Officer, and the Medical and

Associate Executive Director of Lincoln's Risk Management Division.  *Id*. ¶ 55.  Kantor was

present for an RCA committee meeting about the case. *Id.* ¶ 56. The RCA review began in approximately January 2020 and was completed on or about February 6, 2020. *Id.* ¶ 57. As a result of the RCA Committee's recommendation, Heiden's initial FPPE was performed with an "increased focus on cross sectional imaging, particularly ED Neuroimaging examinations." *Id.* ¶¶ 62, 326. Kantor reviewed the case with Heiden before the first meeting of the RCA committee, and he asked Heiden to addend, or correct his initial case report for the patient to reflect the error and the correct diagnosis. *Id.* ¶¶ 58–59. The parties dispute whether Heiden addended the patient's initial case report correctly the first time; Defendants assert that Kantor reviewed the case with Heiden a second time and asked him to re-addend the report. *Id.* ¶¶ 60–61. The Root Cause report indicated that the misdiagnosis that was the basis of Heiden's RCA was a "relatively subtle hemorrhage [that] was not appreciated on an initial interpretation of the Head CT." *Id.* ¶ 328; Dkt. No. 70-1 at 22.

Also in December 2019, Heiden met with Dr. Sarwat Amer ("Amer") about Heiden's work performance. Dkt. No. 72 ¶ 63. Amer is a senior radiologist at Lincoln. *Id.* ¶ 64. Amer informed him that "there [were] some misses and that [Heiden] should be more careful and [Heiden] responded by telling [Amer] that [Heiden] was going to slow down [his] reading to make it more accurate." *Id.* ¶ 65.[3]

### B. January 2020 Bowel Cancer Overcall

In or around January 2020, Heiden mistakenly concluded from a CAT scan that the patient had a severe progression of cancer in his bowels. *Id.* ¶ 127. The CAT scan reflected that

---

[3] The parties also dispute whether another conversation with Dr. Talya Toledano ("Toledano") occurred, in which Toledano allegedly told Heiden that he had "missed several pelvic and vertebral fractures and there was a lot of hemorrhage or bleeding in the patient's pelvis, all of which [Heiden] had missed on his CAT scan reading." *Id.* ¶ 66. Heiden, in a sworn declaration, denies that this conversation occurred. Dkt. No. 71 ¶ 1. Viewing the facts in the light most favorable to Heiden, the Court disregards this conversation.

there was no cancer and that the patient's bowels were normal. *Id*. ¶ 128. As a result of this error, the patient was scheduled for an unnecessary biopsy. *Id*. ¶ 129. Dr. Hasan Grimm ("Grimm") was notified of this error by an interventional radiologist and discussed the error with Dr. Caroline Hwang ("Hwang"), an oncologist. *Id*. ¶ 130. Grimm, Hwang, and the interventional radiologist recognized and corrected Heiden's error before the unnecessary biopsy was performed. *Id*. ¶ 131.[4] If the error had not been corrected, the patient likely would have been subject to invasive and unnecessary procedures. *Id*. ¶ 136. Because Heiden had identified a tumor in the patient, the case was presented to Lincoln's "tumor board," a weekly meeting at which "malignancy cases are presented by the clinical staff" and reviewed by radiologists, pathologists, oncologists, surgical oncologists, and social workers, among others, to determine patient care. *Id*. ¶¶ 132–33. Dr. Talya Toledano ("Toledano"), a specialist in musculoskeletal radiology, presented Heiden's misdiagnosed cancer case to the surgeons and oncologists on Lincoln's tumor board. *Id*. ¶ 134. Toledano, Grimm, and Dr. Menachem Gold ("Gold"), a specialist in neuroradiology, testified that that they believed that Heiden's error in mistaking a normal bowel for a progress of cancer constituted an "egregious" and "embarrassing" error. *Id*. ¶ 135. Kantor was made aware, through conversations with Grimm, Toledano, and Dr. Joseph Arampulikan ("Arampulikan"), that doctors on Lincoln's "tumor board" had concerns about Heiden's ability to read and interpret cancer cases. *Id*. ¶ 138. Kantor was made aware of the error by Arampulikan, *id*. ¶ 140, and was also made aware that Dr. Ali Raza ("Raza") did not

---

[4] Heiden admits all of these facts. He also notes that it was "'not uncommon' for radiologists to disagree" and that every time the radiologists met, they "discuss[ed] cases that people missed or might have missed or another doctor thinks they missed." He further asserts that "many of Heiden's colleagues had 'misses.'" *See, e.g.*, *id*. ¶¶ 127–31. He also notes that one of Heiden's colleagues, Dr. Aziz Amin ("Amin"), had more "misses" than Heiden, *see, e.g.*, *id*. ¶¶ 147–49, although it appears that he intended to refer to Amer, not Amin, *see* Dkt. Nos. 69-12, 69-13, 69-14. These statements, even if true, do not dispute any of the facts asserted by Defendants.

want Heiden to present to the tumor board, *id*. ¶ 139.  Kantor testified that the error was "pretty significant and easy to see."  *Id*. ¶ 141.  Kantor reviewed the bowel cancer overcall with Heiden prior to his January–March 2020 FPPE and asked Heiden to addend the case report.  *Id*. ¶ 142.

### C.   Heiden's January–March 2020 FPPE

Heiden's FPPE began in January 2020 and concluded on or about March 10, 2020.  It had an "increased focus on cross sectional imaging, particularly ED Neuroimaging examinations" due to the RCA.  *Id*. ¶ 75; Dkt. No. 69-2 at 171 (Kantor testimony that "we completed the review in the second week of March").  The panel of physicians that reviewed Heiden's cases for the FPPE consisted of Kantor, Grimm, and Gold.  Dkt. No. 72  ¶ 76.  Kantor had asked Grimm and Gold separately to participate in Heiden's FPPE review in January 2020.  *Id*. ¶ 77.  Heiden was not informed of which doctors reviewed his cases in connection with the FPPE.  *Id*. ¶ 78.  The FPPE panel reviewed over two hundred cases randomly selected by Kantor that Heiden interpreted from November 2019 through February 2020.  *Id*. ¶ 80.  Grimm and Kantor met, compiled data, and finalized the results of the FPPE on March 2 and March 10, 2020.  *Id*. ¶ 79. The results from the data showed that Kantor, Grimm, and Gold concurred with Heiden's recommendations 93.8% of the time.  *Id*. ¶ 112.

The FPPE categorized each of Heiden's cases assigned for review as following:

- 1: Concur with interpretation;

- 2a: Difficult diagnosis, not ordinarily expected to be made, but not clinically significant (i.e., a difficult missed diagnosis, but does not affect the patient's care);

- 2b: Difficult diagnosis, not ordinarily expected to be made, and clinically significant (i.e., a difficult missed diagnosis that negatively affects the patient's care);

- 3a: Determination should be made most of the time, but not clinically significant; and

- 3b: Determination should be made most of the time, and clinically significant.

*Id*. ¶ 111.  Cases rated as 2a were not counted as discrepancies for the purposes of FPPE review. *Id*. ¶ 113.

Heiden's FPPE review categorized approximately eleven cases as category 3b errors—determinations that should be made most of the time and were clinically significant.  *Id*. ¶ 114. Kantor testified that some of those cases were not just "visual" mistakes but that Heiden "didn't know the pathology he was looking at."  *Id*. ¶ 151.

The FPPE report also reflected the concerns of other clinicians and physicians at Lincoln about Heiden's performance, stating that there were "[v]erbal reports from referring clinical staff of lack of clarity of reports + interpretive errors."  *Id*. ¶ 117; Dkt. No. 60-33 (FPPE report).[5] Kantor testified that multiple Lincoln physicians, including radiologists, oncologists, and others had concerns about Heiden's performance.  Dkt. No. 72 ¶ 118; Dkt. No. 69-2 at 123–29 (Kantor testimony describing conversations with others).  In particular, before March 2020, Grimm, Gold, Toledano, and Arampulikan all relayed to Kantor their observations and reports of Heiden's errors and poor performance.  Dkt. No. 72 ¶ 119.  Grimm and Kantor were both on the quality assurance committee and met regularly to discuss cases read by Lincoln radiologists.  *Id*. ¶ 120.  Grimm had discussed her concerns about Heiden's performance with Kantor beginning in or about November or December 2019.  *Id*. ¶ 121; Dkt. No. 60-5 at 64–65 (Grimm testimony describing discussions with Kantor about Heiden's work and Heiden not "doing the protocols"). Grimm had also discussed with Kantor problems with the performance of radiologists other than

---

[5] In his Response to Defendants' Rule 56.1 Statement, Heiden states that he was not aware of the complaints: he "was never made aware of any complaints from hospital clinicians," that "there was no discussion of dismissing Heiden prior to his accommodation request," and that he was "permitted to work from December 2019 to the end of March 2020 without restrictions."  Dkt. No. 72 ¶ 117.  But he does not refute that the clinicians made such complaints and that Kantor heard them.

Heiden.  Dkt. No. 72 ¶ 122.  Toledano had expressed her concerns to Dr. Kantor in February

2020 that he was "making more mistakes than [she] considered acceptable of . . . a more

egregious severity and in a shorter period of time than . . . acceptable."  Dkt. No. 60-7 at 57.

Grimm and Toledano both testified that they believed, prior to his firing, that Heiden was a

poorly performing radiologist and thus that his separation from Lincoln was inevitable and

warranted.  Dkt. No. 72 ¶ 126; Dkt. No. 60-7 at 17 (Toledano testimony); Dkt. No 60-5 at 75–76

(Grimm testimony).  Finally, prior to Heiden's January–March 2020 FPPE, Gold informed

Kantor about an error involving an identification of a misplaced feeding tube.  Dkt. No. 72 ¶ 147.

Gold had been informed by a nurse who noticed the error and brought it to Gold's attention.  *Id*.

¶ 149.  Heiden had misidentified the feeding tube as located in the patient's stomach, when it

was actually in the patient's esophagus.  *Id*. ¶ 148.

### D.      Kantor Meets with Heiden Regarding the FPPE

During the week of March 22, 2020, Kantor met with Heiden to discuss the results of the

FPPE.  Nearly simultaneously, Heiden submitted a request for an accommodation to work

remotely.  This section addresses the discussions regarding the FPPE.  The following section

addresses Heiden's request for an accommodation.

In the afternoon on March 23, 2020, Kantor emailed Bhaskar Sahni ("Sahni"), the Chief

Affiliation Officer for PAGNY, and Nicole Delts ("Delts"), the Corporate Human Resources

Director for PAGNY, concerning Heiden's FPPE results and the next steps to take with Heiden.

*Id*. ¶ 301.  In that email, Kantor stated that he was planning to meet with Heiden regarding his

"random case peer review" and that he would need to discuss with Heiden "the need to improve

his performance."  *Id*.  He relayed his plan to discuss with Heiden that Lincoln was prepared to

help him improve his performance but would need to reevaluate that performance over the

following few months.  *Id*.  The email stated that Heiden's

official start date is listed as 9/1/2019 (earlier than I recalled), and his initial FPPE is therefore due at the end of the month. We have completed an initial review of over 250 random cases as well as review of cases that have been presented because of fall outs. I have met with him once to review the non-random fallouts and will review the random case peer review later this week. I believe, even in light of our previous discussion that I need to discuss with him the *need to improve his performance and how we might help him do so and that we will reevaluate over the next few months*. Does this sound like a reasonable approach?

*Id*. ¶ 101 (emphasis added); *id*. ¶ 301.

Delts responded to Kantor that she agreed with his approach, stating that "[a] formal discussion regarding any deficiencies and corrections needed with time period for improvement is best practice." *Id*. ¶ 105.

Kantor met with Heiden on March 24, March 25, and March 26, 2020 to discuss the FPPE and next steps.  The first FPPE meeting was held on March 24, 2020.  *Id*. ¶ 324.  It is undisputed that Kantor told Heiden which cases were erroneous.  Kantor testified that he was "not sure what happened day one and day two as we sort of completed the review."  Dkt. No. 69-2 at 173.  Kantor testified that "we went through a lot of the cases.  And then at the end he asked me to write down because he wanted to rereview some of the cases and I wrote down on a piece of paper some of the cases we had just reviewed that first day."  *Id*.  Kantor then gave Heiden an excel sheet of the cases "to review the next day to review again." *Id*. at 174, 179.  Although Heiden testified that Kantor "wouldn't show me any case" on March 24, he similarly testifies that at the end of that day, he requested the list of cases that the FPPE panel had identified as containing errors, and that he received an excel sheet of the cases the next day.  Dkt. No. 72 ¶¶ 340, 342; Dkt. No. 69-1 at 102.  That spreadsheet included a categorization of the exam, an identification number, the date of the exam, and explained the error at issue.  Dkt. No. 60-34.

During the March 24, 2020 meeting, Kantor filled out the FPPE evaluation form.  Dkt. No. 72 ¶ 81; Dkt. No. 60-33 (stating date of March 24, 2020).  Kantor testified that he made

these "notes as [they] completed the conversation on the review itself." Dkt. No. 69-2 at 172.

Kantor noted in the form "Case review: anonymized peer review evaluation 97.53% concurrence

rate." Dkt. No. 60-33.  Below it, Kantor wrote "FPPE Review: 93.8% concurrence rate." *Id*.

And below that, he wrote "Criteria 97 % concurrence rate (2b, 3a, 3b).  (2a) review not included

in divergence reports." *Id*.  The form contained items for "interpretation," "report quality," and

"staff feedback." *Id*.  "Interpretation" refers to Heiden's reports of imaging studies.  Dkt. No. 72

¶ 108.  "Report quality" refers to whether "the substance of Heiden's reports on imaging studies

are understandable, logical, and provide a conclusion, even if the conclusion is incorrect." *Id*. ¶

109.  "Staff feedback" includes "reports about Heiden's work made by other medical staff to

Kantor concerning Heiden's work performance." *Id.* ¶ 110.  In the FPPE form, Kantor recorded

that Heiden did not meet expectations on "interpretation," on "report quality," and on "staff

feedback." Dkt. No. 60-33.  He also recorded that Heiden had "difficulties with report clarity

macros can be amended with editing." *Id*.; Dkt. No. 69-2 at 211–12.  Kantor explained that those

macros refer to clicking certain buttons to type out words instead of actually typing them out,

and that "[Heiden] had macros in places th[at] weren't clear because they didn't belong where he

was putting them." Dkt. 69-2 at 212.  Kantor also wrote that "[r]eport discrepancies appear

related to knowledge-based deficits than perceptual error.  All reviewed with Dr. Heiden. *He

will attempt to improve knowledge base in deficit areas.  Review in three months*." Dkt. No. 72 ¶

152 (emphasis added); Dkt. No. 60-33. Finally, Kantor wrote that there were "[v]erbal reports

from referring clinical staff of lack of clarity of reports + interpretive errors." Dkt. No. 72 ¶ 117;

Dkt. No. 60-33 (FPPE form); Dkt. No. 69-2 at 220 (Kantor testimony describing the same).

Kantor dated the form March 24, 2020 and added his signature.  Heiden also signed the

document. Dkt. No. 60-33.  There is no dispute that Kantor had set the minimum concurrence

rate, or the rate at which the FPPE panel would concur with Heiden's determinations, at 97% or that Heiden's concurrence rate was 93.8% based on the findings of the panel members, although, as discussed below, Heiden disputes the accuracy of the panel's findings.  Dkt. No. 72 ¶¶ 115, 330.[6]

As previously noted, the following day on March 25, 2020, Heiden was presented with the list of eleven cases where he had made category "3b" interpretation errors.  *Id.* ¶¶ 156, 342. Heiden independently went over many of those cases himself.  Dkt. No. 69-1 at 131.  Kantor testified that they continued to review cases on March 25, 2020.  Dkt. No. 69-2 at 174.  Kantor stated that, "after I had the review with him . . . , he had his list of cases and he kept coming back to review it, to argue about cases."  *Id.* at 181.  Heiden did not agree that he had a knowledge-based problem with his performance.  Dkt. No. 72 ¶ 162.

Consistent with the email he had sent on March 23, 2020 to Sahni and Delts, Kantor initially offered Heiden a three-month improvement period during the meetings on March 24 and March 25, 2020.  *Id.* ¶ 154; Dkt. No. 60-33 (FPPE Report from Kantor which indicates "Review in 3 months" and dated March 24, 2020); Dkt. No. 69-2 at 174 (Kantor testimony that "we came up with a plan that I would monitor him for an additional three months" "before we finished up the initial review").  Construing the evidence favorably to Heiden, Kantor also conveyed that while Heiden had three months to cure his errors, Kantor did not think Heiden was "going to be able to do it" and told him that "it's very unlikely that you'll be able to redeem yourself."  Dkt.

---

[6] Heiden also contends that had the FPPE panel reviewed a different set of his cases, the panel would have reached a different result and that he would have received a passing grade of 97.53%, with the misses being "almost all [category] 1s, almost all normal."  *Id.* ¶ 107; Dkt. No. 69-2 at 213 (Kantor's testimony describing the 97.53 concurrence rate for the anonymous review).  However, as discussed below, he offers no evidence that the cases the FPPE panel did review were chosen with any kind of retaliatory or discriminatory intent.

No. 69-1 at 103–05.  Although Kantor conveyed that it was "highly unlikely" that Heiden would

pass the review, he did not forbid Heiden from having the review period.  *Id.* at 122 ("Q. He said

he is forbidding you from having a three month review? A. No. He said it's highly unlikely that

I'm going to pass it.").[7]

There were multiple subsequent conversations on the FPPE on Thursday, March 26,

2020.  Dkt. No. 69-1 at 115.  The first conversation involved Heiden and Kantor.  *Id.* at 116; Dkt.

No. 69-2 at 186–87 (Kantor's testimony).  In later conversations, Heiden was joined by his wife,

Lisa Kandel ("Kandel"), an attorney licensed to practice in the State of New York.  Dkt. No. 72

¶¶ 164–66.  Over the course of the conversations on March 26, 2020, Kantor relayed to Heiden

and Kandel that there were "marked deficiencies" in Heiden's work performance, that Heiden

could not be "unmonitored," that other doctors did not want to work with Heiden, that Heiden

put patients at risk, and that Heiden "can't stay on staff."  *Id.* ¶ 167.  At one point during the

discussion on March 26, 2020, Kandel made a statement about Heiden's request for an

accommodation, to be discussed in the next subsection.  With that exception, Kantor did not

otherwise discuss the accommodation request with Heiden or Kandel between March 22, 2020

(the time of Heiden's accommodation request) and March 26, 2020.  *Id.* ¶¶ 187–88.

There is some difference of recollection and characterization about the conversations that

took place from March 24 to March 26, 2020, but not about the outcome.  Kantor testified that he

and Heiden "went over each individual case" and that Heiden initially told him that he did not

make any errors, but eventually agreed that there were a "couple" of errors.  Dkt. No. 69-2 at

---

[7] In his deposition testimony, Heiden testified that his takeaway was that "he was not willing to give me a chance" and "[i]t was not in good faith."  *Id.* at 115.  But there is no dispute that Kantor offered Heiden the three-month period and conveyed that there was at least the possibility that Heiden would be able to satisfy it.

187–88.  Kantor also testified that he said to Kandel that Heiden and Kantor had together "went over multiple cases" and told her that "he . . . didn't seem willing to accept the errors and was arguing with me."  *Id.* at 194; *see also id.* at 181–87 (outlining disagreements during March 24 and March 25, 2020).  Heiden's contemporaneous notes also stated that he "discussed each of them with Dr. Kanter" on Wednesday, March 25, 2020 and that he was "in partial or complete disagreement with 6 of these cases.  In some I thought my diagnosis was correct.  In others I thought he was calling incidental findings as significant misses."  Dkt. No. 60-18; *see also* Dkt. No. 69-1 at 131 (establishing notes as contemporaneous account).  What is undisputed is that Heiden did not accept the conclusions of the panel, but resisted them.  Heiden testified that, when asked whether he ever spoke to Kantor on "any of the cases" to say "listen, I disagree, I was actually correct because of X, Y, Z," he responded "Well, there were a couple of cases early on where we had disagreements and I told him [of] this.  But most of these cases were de novo and where the FPPE [sic] I did not get a chance to defend myself."  Dkt. No. 69-1 at 114.  Heiden did not testify to the words used by Kantor, but contended that Kantor was unwilling to engage Heiden on his disagreements: "I didn't have a chance to [express my disagreement].  After we chatted, [Kantor] would be unavailable.  The only thing he would tell me is that I'm not able to cure my deficiencies.  He never *really* talked about the cases."  Dkt. No. 69-1 at 114 (emphasis added).  Heiden testified to his perception that Kantor did not want to talk to Heiden about the cases.  *Id.*  Heiden also testified that Kantor then told Heiden on March 26, 2020 about some of the patient cases, including some about "omental thickening," a "fracture of the knee," and a "subarachnoid hemorrhage."  *Id.* at 120.  When asked at deposition why he did not argue his view when Kantor raised those cases, he stated he did not because he was "very shaken" and "devastated."  *Id.*

In their last conversations together, Kantor told Heiden that "if you're not willing to agree that you made errors [and] that we have some education here to do, which is what we originally said, then I don't think you should work here."  Dkt. No. 72 ¶ 163.  Kantor testified that is when he told Heiden that "he shouldn't work there."  Dkt. No. 69-2 at 188.[8]  Kantor told Heiden and Kandel that "he did not believe [Heiden] should remain on staff at Lincoln" and told Heiden that he would recommend against extending Heiden's privileges due to his inability and unwillingness to improve.  Dkt. No. 72 ¶ 168.  Heiden testified that Kantor told him on March 26, 2020 that he "had to resign or he would fire [him] and . . . report [him] to the licensing authorities."  Dkt. No. 69-1 at 78; *see also id.* at 159 (Heiden testimony that Kantor told him on March 26, 2020 that he would fire him "with cause" and "report [him] to [OPMC]").  He further stated that Kantor told him he wanted him to resign by March 30, 2020.  *Id*. at 92–93. ("Q: Did he say he wanted you out?  A: Oh, yes.  Q: What did he say?  A: I want you to resign by Monday, the 30th of March 2020.").  Kandel's testimony was to the same effect.  She testified that Kantor "explain[ed] that if Richard [Heiden] were terminated, that would be a reportable event to the state.  He went on to say that if Richard were to resign, he's not sure whether that would be reportable.  He would have to consult with HR."  Dkt. No. 69-7 at 18–19.  Kandel's handwritten notes at the time of those conversations include "if he resigns, what kind of reporting do I have to do?"  Dkt. No. 72 ¶ 170.  Kantor testified similarly.  Dkt. No. 69-2 at 193.  At some point between March 26 and March 27, 2020, Kantor called legal or human resources ("HR") to confirm that he would not have to report Heiden if he resigned.  *Id*. at 200.

---

[8] According to Toledano, prior to late March 2020, there were no discussions about terminating Heiden's employment.  Dkt. No. 72 ¶ 383.

The following day, Friday, March 27, 2020, Kandel emailed Kantor to inform him that Heiden felt ill and asked to "table" discussions regarding Heiden's employment status.  She also sent Heiden's completed accommodation request forms, as further described below.  Dkt. No. 72 ¶¶ 189–90, 364.  Heiden testified that as a result of Kantor's "threat" to report Heiden to the OPMC, he experienced stomach pains, sleep disruptions, headache, heart palpitations, depression, and anxiety.  *Id*. ¶ 360.  Kantor had another conversation with Kandel that day, in which he told her that if Heiden did not resign he would recommend that his association with Lincoln be terminated.  According to Kantor:

> And I told her right up front that if he would -- if he left on his own, he resigned, I'm not going to take it any further. It's just -- there's not going to be -- no one would know and there wouldn't be reporting. I did say I obviously – if people called to ask -- you know, call his places of work for recommendations, I would tell them what I thought and that we didn't think he did well here.

> If he doesn't resign -- and I did mention that I did not want him working here any more -- that I would take it further -- I would take it upstairs or -- I probably said upstairs. And what they do is out of my hands. I'm just going to take it to people -- because I don't think he should be working here.

Dkt. No. 69-2 at 198.

On Monday, March 30, 2020, Kandel again emailed Kantor, indicating that Heiden was still unwell, but that she would "reach out to" Kantor that afternoon.  Dkt. No. 72 ¶ 195.  That same day, Trevor Bolden ("Bolden") of the Doctors Council, Heiden's union, emailed Sahni, "[c]an you please give me a call regarding Dr. Heiden from your radiology department.  He was told to resign by today or be terminated and reported.  I'd like to discuss an exit strategy." *Id*. ¶ 196.

Further discussion ensued with Bolden about the consequences for Heiden if he resigned.  On March 31, 2020, Bolden spoke with Shaun Ravenel ("Ravenel"), an HR business partner at PAGNY, and asked whether Heiden would be reported to the OPMC and whether he would

continue to enjoy his benefits if he resigned.  *Id.* ¶ 371.  Bolden also asked whether Heiden

"could have three months to catch up" on his case work.  *Id.* ¶ 372.  Ravenel testified that she

was surprised by discussion of Heiden's resignation because Heiden had not said anything about

resigning.  *Id.* ¶ 373.  Ravenel then spoke with Kantor, who told her that he was not willing to

give Heiden three additional months to rectify his performance deficiencies.  *Id.* ¶ 375.[9]  That

same day, Ravenel emailed Delts to report that Heiden was "ok with resigning" but had

questions about his benefits and whether he would be reported to OPMC:

> DC rep T. Bolden reached out to me on Dr. Heiden's behalf regarding his PAGNY
> employment. Dr. Heiden is ok with resigning but wants to know: 1. Can he wait a
> couple of weeks before submitting a resignation notice due to his physician's
> isolation recommendation? He's concerned about his medical benefits due to him
> currently being tested for COVID 19. 2. If he resigns, will PAGNY not report him
> to OPMC?

*Id.* ¶ 197.  Delts responded that "[i]f [Heiden] resigns April 1st his benefits will continue until

the end of April. I don't believe we have any cause to report him to OPMC – he is not under any

discipline currently."  *Id.* ¶ 198.  Ravenel passed this information on to Bolden, telling him that

"[i]f Dr. Heiden resigns after April 1st his benefits will continue until the end of April and he

will not be reported to OPMC."  *Id.* ¶ 199.

  With that information in hand, on April 2, 2020, Heiden submitted a resignation through

an email to Kantor.  *Id.* ¶¶ 202, 378; Dkt. No. 69-53.  Kantor forwarded Heiden's email to Fisher

and stated: "Problem we discussed earlier is no longer an issue."  Dkt. No. 72 ¶ 379.  Heiden was

terminated on April 3, 2020.  *Id.* ¶ 380.

  Heiden testified that he did not raise any concerns arising from his conversations with

Kantor to any of Kantor's superiors at Lincoln or PAGNY or in Human Resources because he

---

[9] Ravenel also recalled that in a conversation on March 30, 2020, Kantor told him that the "three
months catchup" was "not an option" for Heiden.  Dkt. No. 72 ¶ 339; *see also* Dkt. No. 64-4 at
58 (Ravenel testimony).

"didn't think [he] had a choice.  [Dr. Kantor] wanted me out."  *Id.* ¶ 205.  Although Heiden

testified that Kandel spoke to HR, Dkt. No. 69-1 at 89,[10] Kandel testified that she had no contact

with HR concerning Heiden's departure from the hospital and the allegations of the failure to

accommodate, Dkt. No. 69-7 at 49.  At the time of Kantor's alleged threat, Heiden was not under

any discipline and there was no cause to report Heiden to OPMC.  *Id.* ¶ 356.

## III.   Heiden's Accommodation Request

After the FPPE panel review had been completed, but before Kantor discussed those

results with Heiden and received his responses, Heiden made a request for an accommodation.

The request does not appear to have been prompted by the FPPE results, but from an email

Heiden received on March 20, 2020 from the Chief Executive Officer of H+H informing

employees that Governor Cuomo had ordered a statewide lockdown that was to go into effect on

March 22, 2020 at 8:00 p.m.  *Id.* ¶¶ 268–69.  On Sunday, March 22, 2020, after returning from

vacation and at the onset of the government lockdown, Heiden sent an email to Kantor

requesting an accommodation that would allow Heiden to work all of his shifts remotely.  *Id.* ¶¶

82–84, 280.  Heiden suffers from ulcerative colitis.  *Id.* ¶ 7.  The letter explained that he has an

"immune disorder" that makes him a high-risk individual for COVID-19.  *Id.* ¶ 282; Dkt. No. 69-

22.  His March 2020 accommodation request expressed concern about risk of exposure to

COVID-19 and requested the accommodation of working from home.  Dkt. No. 72 ¶¶ 85, 282;

Dkt. No. 69-22.[11]  In his letter, he stated that he could "continue to perform the essential

functions of his job without accommodation" and that except for fluoroscopy, his job could be

done entirely from his home.  Heiden also offered to "pay whatever costs" were "necessary to

---

[10] Heiden's testimony on this point is hearsay and thus not cognizable on the motion for
summary judgment.  In any event, it is immaterial to the Court's conclusions.

[11] To reach his office at work, Heiden had to go through "common rooms" at the hospital which
at the time were "filled to the gills" with COVID patients.  Dkt. No. 72 ¶¶ 271, 279.

facilitate to this remote work set up." Dkt. No. 72 ¶¶ 85, 289; Dkt. No. 69-22. Heiden similarly

testified that the only portion of the job responsibilities that he would not have been able to

perform remotely was fluoroscopy, which was less than 3% of his total workload. Dkt. No. 72

¶ 288.

   At the time, H+H had begun implementing remote work. *Id* ¶ 89. With respect to

COVID-19, if providers were able to "provide telehealth from home" and "medical

documentation" that indicated that "being onsite presented a great risk" to them, they were

"allowed to work from home for a period of time." *Id.* ¶ 286; Dkt. No. 69-4 at 23 (Ravenel

Testimony). At the onset of the COVID-19 pandemic, there were physicians "across the board"

at Lincoln who asked to work from home, and those departments that could accommodate did so.

Dkt. No. 72 ¶¶ 262–63. There were several physicians permitted to work from home when they

had conditions that put them at risk, such as autoimmune diseases. *Id.* ¶ 285.

   In or about March 2020, H+H had decided to permit its facilities to issue a "limited

number" of workstations to radiologists to facilitate remote work in the event of COVID-related

staffing shortages. *Id.* ¶ 88. Kantor had begun the process of acquiring remote radiology

workstations in March 2020 due to the COVID-19 pandemic and thought it was a "great idea."

*Id.* ¶¶ 265–66, 387. Kantor determined which radiologists at Lincoln would receive remote

workstations under H+H's remote work policy, and he made those decisions in the second or

third week of March. *Id.* ¶¶ 91, 388–90. Kantor testified that if the radiologists are not

performing procedures in-house, then "most of what radiologists do" can be performed from

home. *Id.* ¶¶ 264, 267.

   Lincoln procedures call for an employee making a request for an accommodation for a

disability to provide Lincoln with a formal request accompanied by a separate form from their

personal physician. *Id*. ¶ 274. After the employee returns the forms, Lincoln's HR department reviews and discusses the request and then discusses the request with the employee's manager. *Id*. ¶ 275. The employee receives written notification of the decision once it is made. *Id*. ¶ 278. Department chairs make the final determination as to whether an accommodation request will be granted. *Id*. ¶ 275. Kantor had the final say as to whether Heiden's accommodation request would be granted. *Id*. ¶¶ 281, 287.

The day that Heiden made the request, March 22, 2020, Kantor informed Heiden that he forwarded his accommodation request to PAGNY HR. *Id*. ¶ 186; Dkt. No. 69-1 at 77. According to Kantor, he "read it briefly," "didn't think about the request," and "shipped it upstairs." Dkt. No. 69-2 at 205. The following morning, on March 23, 2020, at the same time as he was expressing the view internally that he intended to work with Heiden for a few months in light of Heiden's FPPE results, Kantor forwarded Heiden's accommodation request letter and email to Dr. Akinola Fisher ("Fisher"), who was the Chief of Ambulatory Care at Lincoln and then-Acting Chief Medical Officer of Lincoln. In his email, Kantor stated that:

> [a]lthough [t]he system is acquiring a limited number of workstations for Radiologists to work from home, this is not going to be immediately available, and Dr. Heiden's skill set does not meet the criteria for the initial installations. If you have a few moments today, I would like to speak with you concerning this request.

Dkt. No. 72 ¶¶ 87, 292.

After emailing Fisher, Kantor also forwarded Heiden's email and accommodation request to Sahni. In his email to Sahni, Kantor indicated that he had already discussed the request with Fisher and requested to speak with Sahni about Heiden's accommodation request. *Id*. ¶ 98; *see also* Dkt. No. 69-2 at 202 ("I spoke to my . . . CMO [Fisher] at the time. And he just said to refer it to PAGNY human resources.").

24

Sahni then forwarded Heiden's request to Delts and Reginal Odom ("Odom"), the Chief Human Resources Officer for PAGNY, asking "please advise as to how we should proceed in this case?" Dkt. No. 72 ¶ 99. Delts responded to Sahni's email, stating that "there are certification forms that are required as part of an accommodation request. I can discuss with you and Dr. Kantor." *Id*. ¶ 100. Sahni and Delts then had a conversation with Kantor to tell him what the accommodation process entailed; during that conversation, Kantor stated that the department was not able to provide computer equipment or things that Heiden might need to access the system virtually. *Id*. ¶¶ 294, 299.

Delts then emailed Heiden, informing him that his accommodation had been forwarded to Delts for handling. *Id*. ¶ 304. Delts attached to her email Heiden's accommodation request to Kantor and a form required to be completed as part of the review process for accommodation requests, and asked Heiden to "[p]lease complete the employee form and have your provider complete the medical questionnaire. Please return to me once complete for review and determination." *Id*. ¶¶ 103–04.[12]

Kantor did not discuss Heiden's accommodation request with Heiden or Kandel between March 22, 2020 (the time of Heiden's accommodation request) and March 26, 2020. *Id*. ¶¶ 187–88. On March 26, on the same day Heiden was discussing his FPPE and resignation with

---

[12] Also on March 23, 2020, the Doctors Council, the labor union to which Heiden and other Lincoln doctors belonged, sent a message recommending that "doctors in high-risk categories due to, for example, older age or chronic medical conditions . . . should . . . ask their employers for accommodation, such as . . . working remotely." *Id*. ¶ 300. Heiden responded by informing the union that he had requested an accommodation and that Kantor had informed him earlier that morning that he had forwarded Heiden's request to "the relevant PAGNY accommodation Section," and attached his accommodation request letter. *Id*. ¶¶ 102, 302–03. The following day, Bolden, on behalf of the Doctor's Council, responded to Heiden's email to the Doctor's Council, informing him that based on his individual situation, his workplace accommodation should be approved as his health could be jeopardized. *Id*. ¶ 307.

Kantor, Kandel stated to Heiden that she "thought it was curious that these issues had arisen after [Heiden] had made a request for accommodation." Dkt. No. 69-7 at 20–21. Kantor, in response, said that "it was coincidental and then . . . said that he thought the radiology reading room was a safe place in the hospital." *Id*. at 22. The record does not reflect any other discussion.

On Friday March 27, 2020, after the discussions the prior three days regarding the FPPE and after Kantor had requested Heiden's resignation, Kandel responded to the request for Heiden's completed accommodation forms in an email that also stated that "Although I recognize that [Heiden's] request for an accommodation has already been rejected, I am taking the liberty of forwarding the [PAGNY accommodation request] form that his doctor completed and emailed to him yesterday indicating that he requires isolation." Dkt. No. 72 ¶¶ 189–90, 364. Attached to Kandel's email was a copy of a PAGNY form that was completed by Heiden's doctor. The form indicated that Heiden requires isolation. *Id*. ¶ 191.

Kantor did not respond to Kandel's email. Dkt. No. 69-7 at 37. Instead, Kantor forwarded Kandel's email and the completed PAGNY form to Sahni with a message to "[p]lease review and forward to appropriate personnel in PAGNY." Dkt. No. 72 ¶ 192. Sahni forwarded the email to Delts and Ravenel, the HR Business Partner then-assigned to Lincoln. *Id*. ¶ 194.

The following Monday, March 30, 2020, Kantor told Ravenel that he was denying Heiden's request for accommodation because he "could not accommodate the request." *Id*. ¶ 367. That same day, Ravenel then told Heiden about the denial of his accommodation request. *Id*. ¶ 370; Dkt. No. 69-4 at 35. Nobody from HR had contacted Heiden between the time of the request that he complete the form requesting an accommodation and the date that he was informed of its denial. Dkt. No. 72 ¶ 306. The record reflects no communications between Kantor and Heiden or Kandel about the request for accommodation other than the March 22,

2020 statement from Kantor to Heiden that the request had been forwarded to HR, the March 26, 2020 comment by Kandel, and the emailing of request forms from Kandel to Kantor on March 27, 2020.  Heiden testified that Kantor never told him that his request for accommodation was denied.  Dkt. No. 69-1 at 129.  Kandel also testified that Heiden's accommodation request was not discussed at all other than the comment she made on March 26, 2020.  Dkt. No. 69-7 at 33.

Lincoln received four remote workstations for use by radiologists in or about April 2020.  Dkt. No. 72 ¶ 89.  Each workstation cost approximately fifteen to twenty-thousand dollars.  *Id.* ¶ 386.  Kantor issued those workstations to Gold, a specialist in neuroradiology, Dr. Aziz Amin ("Amin"), a specialist in pediatric radiology, Toledano, a specialist in musculoskeletal radiology, and Grimm, a specialist in body imaging radiology.  *Id.* ¶ 93.  Those radiologists were able to use the remote stations on their "extra shifts"—those shifts that were not prescheduled or part of the regular shift and were volunteered for on a case-by case basis.  *Id.* ¶¶ 94–95.  Kantor did not permit radiologists to use the remote stations during their regular shift.  *Id.* ¶ 96.  Heiden asserts that those workstations "went largely unused."  *Id.* ¶¶ 94, 397.  Kantor testified that he requested workstations for radiologists who "absolutely" needed to be covered in the event of a COVID-19 related staffing shortage, such as neuroradiology, musculoskeletal radiology, body imaging, and pediatric radiology, but also admitted that he did not consider whether to give home workstations to radiologists who suffered from autoimmune disease and needed to work off-site.  *Id.* ¶ 92.  As of December 2021, Kantor was acquiring additional workstations in order to enable more medical providers to work remotely.  *Id.* ¶ 398.

IV.     **Heiden's Resignation from CIH[13]**

While employed at Lincoln, Heiden retained his privileges at CIH as a sessional radiologist.  *Id.* ¶¶ 206, 399.  After his resignation from Lincoln, Heiden contacted Patel to inquire about employment opportunities at CIH.  *Id.* ¶¶ 207, 400.  Following review of CIH's records of Heiden's work, and after making specific note of his missed finding related to a lung cancer diagnosis in 2019 at CIH that resulted in an RCA, Patel informed him that he did not support the renewal of Heiden's credentials at CIH.  *Id.* ¶¶ 208, 210, 401.  Patel also spoke to Kantor about the end of Heiden's employment at Lincoln.  Kantor relayed that Heiden decided to leave employment at Lincoln but did not elaborate further.  *Id.* ¶ 211.  Patel then requested that Heiden formally resign his position as a sessional radiologist at CIH.  *Id.* ¶ 212.  It is common practice for Patel to request a physician's resignation when that physician no longer regularly practices at CIH.  *Id.* ¶ 213.  If Heiden had applied for renewal of his credentials at CIH and his application was rejected, Heiden would have been reported to OPMC.  *Id.* ¶ 402.  On June 29, 2020, Geraldine Montero, the CIH Radiology Department Coordinating Manager, emailed Heiden, requesting that he "provide/email [her] with a letter of resignation.  Pagny Human Resources and the Medical Staff Office is requesting one for your file."  *Id.* ¶ 403.  On June 30, 2020, Heiden sent an email to Patel resigning from CIH.  *Id.* ¶¶ 214, 404.

V.      **Heiden's EEOC Complaint**

On or about October 4, 2020, Heiden filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated against on the basis of his disability and retaliated against for engaging in a

---

[13] Defendants argue that any allegations that Patel asking Plaintiff to resign at CIH was related to his disability or accommodation is "meritless," contending that it was related to his errors at CIH.  Dkt. No. 66 at 25.  Plaintiff has abandoned any claims related to his subsequent resignation at CIH by not addressing them in his opposition to summary judgment.

protected activity.  *Id.* ¶ 2.  The EEOC issued Heiden a dismissal and informed him of his rights to suit on November 17, 2020.  *Id.* ¶ 3.

## PROCEDURAL HISTORY

Plaintiff filed his complaint on December 7, 2020, alleging discrimination and retaliation in violation of the ADA against defendants H+H and PAGNY, discrimination and retaliation in violation of NYSHRL against all Defendants, and discrimination and retaliation in violation of NYCHRL against all Defendants.  Dkt. No. 1.  The complaint alleges that discrimination occurred "by *inter alia*, denying him equal terms and conditions of employment, and failing to provide a reasonable accommodation."  *Id.* ¶¶ 55, 65, 75.  Defendants filed their answer on February 15, 2021.  Dkt. No. 20.

Defendants then filed their motion for summary judgment, Rule 56.1 Statement, accompanying declarations, and their motion to seal on June 6, 2022.  Dkt. Nos. 58–61.  Plaintiff filed his opposition to the motion for summary judgment, Counterstatement to Defendants' Rule 56.1 Statement, and accompanying declarations on July 26, 2022.  Dkt. Nos. 69–74.  Defendants filed their reply in support of summary judgment and their motion to strike on October 11, 2022.  Dkt. Nos. 86–90.  Plaintiff filed his opposition to Defendants' motion to strike on October 25, 2022.  Dkt. No. 91.  Defendants filed their reply in support of their motion to strike on November 1, 2022.  Dkt. No. 92.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."

*Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008).

 "[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-

moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great

Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114

(2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R.

Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-

moving party must also demonstrate more than "some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation

omitted).

In cases involving claims of discrimination, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz*, 258 F.3d at 69) (citation omitted).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented.  Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the

statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

## DISCUSSION

Defendants move for summary judgment on all claims under the ADA, NYSHRL, and NYCHRL, arguing that (1) Plaintiff cannot demonstrate constructive discharge; (2) Plaintiff was not qualified for the position; (3) Plaintiff cannot demonstrate an inference of discriminatory or retaliatory intent; and (4) Defendants had legitimate reasons for their actions and Plaintiff otherwise cannot show that such reasons were pretextual.  Dkt. No. 66.  Plaintiff disputes all of these contentions.  Dkt. No. 73.  For the reasons that follow, the Court grants the motion for summary judgment in part and denies it in part.

## I.       Discrimination and Retaliation Claims

Under the ADA, NYSHRL, and NYCHRL, it is unlawful to discriminate "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *see also* N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8–107(1)(a).  Employment discrimination claims under the ADA and NYSHRL on the basis of disability are governed by the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *Malzberg v. New York Univ.*, 2022 WL 889240, at *9 n.5 (S.D.N.Y. Mar. 25, 2022); *Stryker v. HSBC Sec. (USA)*, 2020 WL 5127461, at *6 (S.D.N.Y. Aug. 31, 2020).  Under the *McDonnell Douglas* framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."

*Sista*, 445 F.3d at 169.  "NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).  "[S]ummary judgment dismissing a claim under the NYCHRL should be granted only if 'no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof.'" *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 378–79 (S.D.N.Y. 2014).

"To establish a prima facie case [of discrimination] under the ADA, a plaintiff must show by a preponderance of the evidence that: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'"  *Sista*, 445 F.3d at 169 (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)); *see also McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009).  The same standards that govern ADA claims govern NYSHRL claims.  *See Graves v. Finch Pruyn & Co.*, Inc., 457 F.3d 181, 184 n.3 (2d Cir. 2006). The NYCHRL, however, requires "an independent and more liberal construction than its federal and state counterparts."  *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 257 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  For NYCHRL claims, "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.  The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that 'discrimination play[ed] no role' in its actions."  *Mihalik*, 715 F.3d at 110 n.8 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n. 27 (1st Dep't 2009)).

For retaliation claims, "[a] prima facie case of retaliation under the ADA is made up of the following elements: '(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action.'"  *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (quoting *Sarno v. Douglas–Elliman Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).  Retaliation claims under the ADA and NYSHRL are "governed by the same standards."  *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 269 (S.D.N.Y. 2020) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  The elements of a prima facie case of retaliation under the NYCHRL are identical, except that "the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity."  *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Leon v. Columbia Univ. Med. Ctr.*, 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013)).

## A.    Plaintiff's Prima Facie Burden

For the purposes of Plaintiff's discrimination claims, Defendants do not contest that they are subject to the relevant statutes or that Plaintiff is disabled.  For the retaliation claims, Defendants do not contest that Plaintiff was engaged in protected activity and that they were aware of that activity.  The Court addresses whether, for the purposes of the prima facie cases of discrimination and retaliation, an adverse employment action has occurred.  The Court then addresses, for purposes of the discrimination and failure-to-accommodate claims, whether Plaintiff was a qualified individual.  Finally, the Court addresses whether Plaintiff has shown an inference of discriminatory or retaliatory intent.

1.    **Adverse Employment Action**

Defendants, for the purposes of Plaintiff's discrimination and retaliation claims, argue that Plaintiff cannot show that an adverse employment action occurred in the form of a constructive discharge.  Dkt. No. 66 at 9–10.  They first briefly assert that Plaintiff was not employed by H+H, but by PAGNY.  *Id.* at 9.  They then argue that Plaintiff failed to take advantage of available avenues to redress his grievances.  *Id.* at 10.  Plaintiff contends that he was constructively discharged because he was threatened with being fired for cause and because the employer failed to provide him necessary accommodation.  *Id.* at 31–32.  For the following reasons, Plaintiff has cited sufficient evidence to permit a reasonable jury to conclude he suffered an adverse employment action through constructive discharge.

An "adverse employment action" is a "'materially adverse change' in the terms and conditions of employment."  *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).  "An adverse employment action may . . . take the form of a constructive discharge, which occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'"  *Caskey v. Cnty. of Ontario*, 560 F. App'x 57, 59 (2d Cir. 2014) (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007)).  "[S]uch an intolerable condition may be shown by evidence that the employer gave the plaintiff the choice of resigning or being fired."  *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020).  "[T]he determination of whether it was objectively reasonable for an employee to feel compelled to resign in order to avoid being fired requires at least an examination of the information possessed by the employee."  *Id*.  "[I]f there is admissible evidence from which a rational juror could infer that a reasonable employee would have felt so compelled, rejection of the constructive-discharge theory as a matter of law is impermissible."  *Id*.  "[C]ourts in this circuit generally have refused to find a constructive

discharge where an employee had an avenue through which he could seek redress for the allegedly 'intolerable' work atmosphere leading up to his resignation, but failed to take advantage thereof." *Silverman v. City of New York*, 216 F. Supp. 2d 108, 115 (E.D.N.Y. 2002), *aff'd*, 64 F. App'x 799 (2d Cir. 2003). Under NYCHRL, the action "need not result . . . in a materially adverse change" so long as "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (quoting N.Y.C. Admin. Code § 8–107(7)). "[T]he constructive discharge can be an adverse employment action for purposes of either" discrimination or retaliation claims. *Monroe v. Cnty. of Orange*, 2016 WL 5394745, at *18 n.20 (S.D.N.Y. Sept. 27, 2016).

Plaintiff has met his prima facie burden of showing an adverse employment action because he has offered evidence from which a reasonable jury could conclude that Kantor had sought to constructive discharge Plaintiff on March 26, 2020. Plaintiff testified that Kantor told him that he "had to resign or he would fire [him] and . . . report [him] to the licensing authorities" on March 26, 2020. Dkt. No. 69-1 at 78. Plaintiff also testified that Kantor expressly asked Plaintiff to resign by the following Monday. *See* Dkt. No. 69-1 ("Q: What did he say [on March 26, 2020]? A: I want you to resign by Monday, the 30th of March 2020."). In *Green v. Town of East Haven,* the Second Circuit reaffirmed the principle from *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2d Cir. 1987), that a statement requesting resignation could show constructive discharge. 952 F.3d at 407. The court stated that "our *Lopez* opinion indicated that a constructive discharge could properly be found where an employer merely, albeit 'clearly[,] expressed *his desire* that [an] employee resign because such a statement' could cause a reasonable person to feel compelled to resign." *Id*. (emphasis and alterations in original).

Kantor's statements on March 26, 2020 could lead a reasonable fact finder to conclude that he had constructively discharged Heiden.

Further, Plaintiff testified to facts from which a jury could conclude that Kantor "deliberately created unbearable working conditions for the purpose of forcing [P]laintiff to resign." *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 284 (S.D.N.Y. 2000). Heiden was confronted with a take-it-or-leave-it offer: Heiden testified that Kantor told him that he "would" fire him "with cause" and "report [him] to [OPMC]." Dkt. No. 69-1 at 159. He explained this as "Dr. Kantor was threatening me . . . he was threatening to say [I] was incompetent." *Id*. at 94; *see also id*. at 80–81, and that "[i]f I am fired with cause, as he was threatening to do, that's a reportable incident automatically to the OPMC," *id*. at 79, and he worried that his "license would be threatened without [him] having a chance to present [his] case," *id.* at 165; *see*, *e.g.*, *Brown v. Bd. of Educ. of City of New Britain*, 107 F. Supp. 3d 232, 237 (D. Conn. 2015) (finding constructive discharge when "employer threatened [plaintiff] with being fired, and it was made clear that such firing would have severe collateral consequences," including loss of her teaching license). Kandel similarly testified that Kantor told her that "if [Heiden] were terminated [as a probationary employee], that would be a reportable event to the state." Dkt. No. 69-7 at 18. Finally, Kantor's testimony on his conversation from March 27, 2020 provided the following:

> And I told her right up front that if he would -- if he left on his own, he resigned, I'm not going to take it any further. It's just -- there's not going to be -- no one would know and there wouldn't be reporting. I did say I obviously – if people called to ask -- you know, call his places of work for recommendations, I would tell them what I thought and that we didn't think he did well here.

> If he doesn't resign -- and I did mention that I did not want him working here any more -- that I would take it further -- I would take it upstairs or -- I probably said upstairs. And what they do is out of my hands. I'm just going to take it to people -- because I don't think he should be working here.

Dkt. No. 69-2 at 198.  These facts, when construed in the light most favorable to Plaintiff, show the imposition of conditions designed to force his resignation, and thus show constructive discharge.  *See McNulty v. Cnty. of Warren, New York*, 2019 WL 1080877, at *12 (N.D.N.Y. Mar. 7, 2019) (finding constructive discharge when, in part, plaintiff "felt that the County's actions forced her to resign," plaintiff experienced severe health effects, and plaintiff felt "if she did not [resign], she would be forced out and could lose her nursing license").[14]

That Kantor indicated that he would "take it upstairs" and that what others did with respect to Plaintiff's employment would be out of his "hands" does not entitle Defendants to summary judgment on the issue of a constructive discharge.  Dkt. 69-2 at 198.  "While the identity of the person delivering a termination threat or prediction and the level of certainty expressed in such a threat or prediction are considerations for a factfinder to weigh, neither an absolute statement nor a direct communication by an ultimate decisionmaker is a *sine qua non* for evidence of a constructive discharge."  *Green*, 952 F.3d at 406.  Here, although Kantor might not have been the ultimate decisionmaker on Plaintiff's employment, he had been instrumental in Plaintiff's hiring and was Plaintiff's supervisor and the Chair of the Radiology Department.  Dkt No. 72 ¶¶ 6, 43, 44, 236, 258.  He testified that he could recommend termination of privileges to the medical board and that the other reviewers "generally agree with [his] recommendations."  Dkt. No. 69-2 at 42.  From these facts, a jury could find that "a reasonable person in [Plaintiff's] shoes would have felt compelled to resign."  *Green*, 952 F.3d at 407 (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998)).

---

[14] The Court rejects Plaintiff's argument that Ravenel's March 30, 2022 communication denying him his requested accommodation informed his constructive discharge.  Dkt. No. 73 at 31. Plaintiff produces no evidence that the denial of his accommodation request contributed to his decision to resign.  *See also infra* note 27.

Defendants' argument that Plaintiff was not constructively discharged because there were avenues to redress his grievances at Lincoln that he did not explore is similarly without merit at this stage of the proceedings.  Defendants argue that Plaintiff could have asked Kantor's superiors and PAGNY's HR division that he be permitted to remain at Lincoln.  But the mere fact that there may be more steps by which Plaintiff could escalate beyond an immediate supervisor does not make it *de facto* unreasonable for a jury to conclude that he had been constructively discharged.  Aside from the brief mention of the "Article II, Medical Staff Membership" document describing internal review, Defendants do not cite any evidence that going above Kantor would have been effective or reasonable for Plaintiff.  Further, Plaintiff testified as to a rationale for not escalating beyond Kantor that a jury could find reasonable.  When Plaintiff answered why he did not "try to go above Dr. Kantor's head," he stated that "I didn't think I had a choice.  He wanted me out."  Dkt. No. 69-1 at 92.  Kandel testified that doing so was not an option because of the "hammer" of "the threat of a report to the OPMC."  Dkt. No. 69-7 at 79.  Plaintiff speculated that such a report would threaten his license without him "having a chance to present [his] case."  Dkt. No. 69-1 at 165.  Again, Kantor testified that the medical board "generally agree[s] with [his] recommendations."  Dkt. No. 69-2 at 42.  In other words, there is a "basis for a reasonable belief" that a jury would conclude that the escalation above Kantor would have been unsuccessful and would have led to reporting to the OPMC and the stripping of Plaintiff's license without an ability to present his case.

The lack of any facts regarding those procedures and their efficacy in this case distinguishes it from the cases cited by Defendants.  For example, in *Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064 (S.D.N.Y. Jan. 4, 2001), an employee other than the plaintiff at issue had previously lodged a complaint and settled and been allowed to keep her title, salary, and benefits.

*Id*. at *13.  Similarly, in *Stembridge*, 88 F. Supp. 2d at 284–85, there were facts showing that the subsequent review process would have been "thorough and fair," with an "opportunity to appear at the conference represented by counsel," "a written decision," an "option of appealing," and an "independent arbiter."  *Id*. at 284–85. Finally, in *Silverman*, 216 F. Supp. 2d 108, there were facts showing that the plaintiff had, when employed by the City of New York's Department of Housing Preservation and Development, "rights under both his collective bargaining agreement and New York Civil Service Law § 75 to a pre-termination hearing."  *Id*. at 116.  Defendants have not identified similar facts here.  To the contrary, there is sufficient evidence for a jury to conclude that it would have been unreasonable to go above Kantor's head because Plaintiff would have lost anyway.  *See Green*, 952 F.3d at 408–09 (rejecting the proposition that "a reasonable employee, as a matter of law, cannot feel compelled to resign rather than insist on a hearing" when there were facts indicating that she would lose at a hearing).

Finally, Defendants assert that Plaintiff was not employed by H+H, but by PAGNY, which possesses an affiliation agreement with H+H.  But Defendants, spending an entirety of two sentences on this argument, do not cite any facts or legal authority to support their contention.  Defendants only cite their Answer.  They do not cite to any provisions in the affiliation agreement, point to any facts describing the circumstances of the employment relationship between Heiden and Defendants, or cite any legal authority from which the Court could determine Plaintiff's employee status vis-a-vis H+H.  The Court thus has no facts for determining the relationship between Plaintiff, PAGNY, and H+H, and no legal authority for determining whether those facts would be material—*e.g*., whether Plaintiff was an independent contractor, employee, or had some other relationship to H+H.  *See Perfect Dental, PLLC v. Allstate Ins. Co.*, 538 F. Supp. 2d 543, 548 (E.D.N.Y. 2007) (describing the independent

contractor/employee inquiry as evaluating the "totality of the circumstances"). Kantor, in his

deposition, also testified that the "hospital . . . is run by the city," and that "they have the power

to hire and fire [Kantor]." Dkt. No. 69-2 at 122. And at least one other court in this District has

found that a doctor "may obtain all the relief she seeks through a judgment against HHC alone,"

even when describing the plaintiff as "technically an employee of PAGNY, a private company

that contracts to supply physicians to Lincoln Hospital." *Henderson v. Physician Affiliate Grp.*

*of New York P.C.*, 2019 WL 3778504, at *3 (S.D.N.Y. Aug. 12, 2019). Defendants have not met

their burden on summary judgment. *See*, *e.g.*, *Freedman v. Am. Online, Inc.*, 303 F. Supp. 2d

121, 129 (D. Conn. 2004) (denying summary judgment when movant "cite[d] no legal authority

and engage[d] in no further discussion of the[ ] issues").

### 2.      Qualified Individual

Defendants contend that summary judgment should be granted on Plaintiff's

discrimination and failure to accommodate claims because Plaintiff was unable to perform the

essential functions of the job. Dkt. No. 66 at 14–15. Plaintiff argues that he has met his prima

facie burden of showing that he was qualified. For the following reasons, Plaintiff has met his

prima facie burden of showing that he was a qualified individual for purposes of the ADA,

NYSHRL, and NYCHRL.

Under the ADA, a "qualified individual" is "an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires." 42 U.S.C. § 12111(8); *see also Malzberg*, 2022 WL 889240,

at *9. "In approaching this inquiry, 'a court must give considerable deference to an employer's

judgment regarding what functions are essential for service in a particular position.'" *Shannon v.*

*New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (quoting *D'Amico v. City of New*

*York*, 132 F.3d 145, 151 (2d Cir. 1998)) (alterations accepted). "[T]he qualification prong must

not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). "To show 'qualification' sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff 'need not show perfect performance or even average performance.'" *Id.* (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). "Instead, she need only make the 'minimal showing' that 'she possesses the basic skills necessary for performance of [the] job.'" *Id.* (internal quotation marks omitted) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)); *see also Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 325 (S.D.N.Y. 2020). Under the NYSHRL, a "qualified individual" is "interpreted coextensively" with the ADA. *Williams v. MTA Bus Co.*, 44 F.4th 115, 124 (2d Cir. 2022). "[U]nder the NYCHRL, like the ADA, a plaintiff bringing a disability discrimination claim in the employment context must be able to perform the essential functions of the job with or without accommodations." *Id.* at 137. "However, . . . the NYCHRL directs that the plaintiff's qualification for the position is not an element of a prima facie case, but rather may be disproven by the employer as an affirmative defense." *Id.*[15]

Plaintiff has proffered enough facts to meet his prima facie burden on the ADA and NYSHRL claims that he was qualified for the position and to defeat the affirmative defense on the NYCHRL claims on summary judgment. It is undisputed that Heiden earned his medical degree and was licensed to practice medicine in New York State and at all relevant times, his license was up to date and in good standing. Dkt. No. 72 ¶¶ 215–16. He completed a residency

---

[15] Defendants raised the affirmative defense of lack of qualifications in their Answer. *See* Dkt. No. 20 ¶ 89.

and fellowship in radiology.  *Id.* ¶¶ 218–20.  Further, he served in a variety of roles—ranging from attending physician to Chairman of Radiology—at the Interfaith Medical Center, Brookdale University Hospital, and Mary Immaculate Hospital.  *Id.* ¶¶ 221–25.  He also served as an Assistant Professor in the Department of Radiology at SUNY Downstate College of Medicine. *Id.* ¶ 222.  Heiden operated his own radiology practice for over twenty years, has served as an expert witness, and has published numerous scholarly articles.  *Id.* ¶¶ 230–32.  For the period immediately before his employment at Lincoln, it is undisputed that Heiden worked at PAGNY as a sessional, or part-time, assistant attending physician in the Radiology Department at the CIH.  *Id.* ¶ 17.  Although he was subject to an FPPE at CIH, the result was "satisfactory."  *Id.* ¶ 229.  He also left CIH in "good standing."  *See id.* ¶¶ 24, 228–29.  All of those facts are undisputed.  Such facts suffice to meet the "minimal showing" of "possess[ing] the basic skills necessary for performance of the job."  *Gregory*, 243 F.3d at 696 (internal quotation marks and citation omitted).

Defendants rely primarily on Plaintiff's results from his FPPE to argue that he is not qualified.  That argument fails because it "shift[s] considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work."  *Powell*, 580 F.2d at 1155.  Plaintiff's burden at the prima facie stage is "minimal"; he "need only show that he "*possesses the basic skills necessary for performance of [the] job*."  *Gregory*, 243 F.3d at 696 (emphasis and alteration in original) (quoting *Owens*, 934 F.2d at 409).  Further, "[i]n a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified."  *Id.* at 696.  As a

part of his hiring, Patel indicated that Heiden was "never considered for disciplinary action," never had his "status or authority to provide services . . . revoked, suspended, restricted, [or] not renewed," and was never placed on "probationary status or reprimanded." Dkt. No. 72 ¶ 243. Two of Heiden's colleagues at CIH also completed peer reference evaluations that were submitted to Lincoln that concluded that Heiden could perform the clinical privileges in a manner "consistent with the requirements for the safety of patients and the public." *Id.* ¶ 246. Kantor interviewed Heiden and recommended Heiden for appointment. *Id.* ¶¶ 249–52. These facts suffice to create a triable issue that Plaintiff was at least minimally qualified for the position. *See, e.g.*, *Norgrove v. N.Y.C. Dep't of Educ.*, 2011 WL 441678, at *2 (E.D.N.Y. Feb. 8, 2011) (finding that "unsatisfactory performance" did not preclude prima facie case of qualification when plaintiff had performed the role for several decades); *Baron v. N.Y.C. Dep't of Educ.*, 2009 WL 1938975, at *5 (E.D.N.Y. July 7, 2009) (finding that "despite unsatisfactory performance during pre-service training," "[t]hat [plaintiff] was accepted into the Program demonstrates that she met its minimum qualifications").[16] When the record is viewed in the light most favorable to Plaintiff, a jury could conclude that Plaintiff was qualified for the position of attending radiologist.

### 3.    Inference of Retaliatory or Discriminatory Intent

Defendants contend that Plaintiff cannot show that he was terminated under circumstances giving rise to an inference of discrimination or retaliation. Dkt. No. 66 at 11, 17.

---

[16] Defendants in their reply brief also raise the "direct threat defense." Dkt. No. 86 at 10. That argument was raised for the first time in the reply brief. The Court declines to consider this untimely-raised argument. *See Diesenhouse v. Soc. Learning & Payments, Inc.*, 2022 WL 3100562, at *6 n.6  (S.D.N.Y. Aug. 3, 2022); *see also Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 384 (S.D.N.Y. 1998) ("New arguments first raised in reply papers in support of a motion will not be considered." (emphasis omitted)); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). The argument will be available for Defendants at trial.

They argue that the only factor purportedly showing discrimination or retaliation is the temporal nexus between his accommodation request and his discharge resulting from the FPPE. *Id*. at 11, 17. They argue that the impetus for his termination—his FPPE and his poor performance therein—began in December 2019 and was concluded by March 10, 2020 before his accommodation request. They also emphasize that the conversations following his accommodation request concerned his poor workplace performance, and not his disability. *Id*. at 13, 18. Plaintiff argues that an inference of discriminatory and retaliatory intent can be found through temporal proximity, procedural irregularities, comparative evidence, and other inconsistencies in the record. Dkt. No. 73 at 15–21. Defendants contend that even if Plaintiff shows a prima facie case, Plaintiff cannot show that Defendants' proffered reasons are pretext for discrimination. Dkt. No. 66 at 21–22.

"A plaintiff establishes a prima facie case of discrimination by demonstrating that he 'suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent.'" *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015) (quoting *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013)). An inference of discriminatory intent may arise from, *inter alia*, "more favorable treatment of employees not in the protected group . . . the sequence of events leading to the plaintiff's discharge . . . , or the timing of the discharge." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

"In order to establish the last element of a prima facie case of retaliation, [the plaintiff] must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." *Treglia*, 313 F.3d at 720. "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed

closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015)).

Plaintiff has satisfied his obligation to proffer sufficient evidence to create an inference of retaliatory or discriminatory intent.  Temporal proximity can create such an inference where the proximity is particularly close.  *See Riddle v. Citigroup*, 640 F. App'x 77, 79 (2d Cir. 2016) ("Although temporal proximity between protected activity and adverse employment action can support an inference of discriminatory intent, the Supreme Court has suggested that "the temporal proximity must be 'very close.'" (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))); *Ragusa v. Malverne Union Free Sch. Dist.,* 582 F. Supp. 2d 326, 348 (E.D.N.Y. 2008), *aff'd in relevant part,* 381 F. App'xApp'x 85 (2d Cir. 2010) ("Temporal proximity alone may suffice to establish causation where proximity is very close."); *see also Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) ("Further undercutting defendants' contention that there is no proof as to causation, the record includes evidence that the treatment that Kessler contends reflected defendants' retaliatory animus followed closely on the heels of his protected activity.").  Here, there is some evidence which could give rise to an inference of discriminatory or retaliatory intent.  At the time Kantor filled out the FPPE form, he had not concluded that Heiden should be terminated.  The emails he sent on March 23, 2020, and the form he completed on March 24, 2020, reflect his presumably pre-existing intent that the results of the FPPE alone would not be sufficient to give rise to a recommendation that Heiden be terminated.  On March 22, 2020, he became aware of Heiden's

request for an accommodation.  The jury could also form the conclusion that, as of that date or the following day, he was aware that he would not be able to grant that accommodation.  Within days thereafter, he told Plaintiff he wanted him to resign.  Although Defendants have proffered legitimate non-discriminatory and non-retaliatory reasons for the actions that Heiden took on March 26, 2020, such evidence is properly considered only at the next stage and not in determining whether Plaintiff has established a prima facie case.

### B.    Legitimate Non-Pretextual Reasons for the Adverse Employment Action

If the plaintiff establishes a prima facie case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher v. Depository Tr. & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir. 2010) ("If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.").

 "An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."  *Gregory*, 243 F.3d at 696; *see also Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 F. App'x 492, 495 (2d Cir. 2009); *Davis v. Avaya, Inc.*, 295 F. App'x 380, 381–82 (2d Cir. 2008) (holding that poor performance is legitimate, nondiscriminatory reason for termination); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (holding that a failure to "perform satisfactorily" is a legitimate, nondiscriminatory reason for dismissal).  "Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which 'may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the

prima facie case, without more.'" *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (quoting *Chambers*, 43 F.3d at 38). "Even assuming [a plaintiff can] prove a prima facie case of constructive discharge . . . summary judgment [would still be] warranted [if he cannot] rais[e] a triable issue of fact as to pretext." *Rupert v. City of Rochester, Dep't of Env't Servs.*, 701 F. Supp. 2d 430, 441 (W.D.N.Y. 2010).

Ultimately, "the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky*, 921 F.3d at 348.

The Second Circuit has not yet determined whether but-for causation applies to ADA retaliation claims. *Norman v. NYU Langone Health Sys.*, 2021 WL 5986999, at *5 (2d Cir. Dec. 17, 2021) (summary order). This Court holds that it does. In *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013), the Supreme Court concluded that "but-for" causation was required to prove a violation of Title VII's antiretaliation provision. *Id.* at 354. The Court rested its determination on the use of the term "because" in the statute, *see* 42 U.S.C. § 2000e–3(a),[17] and on its prior holding in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), that the term "because of . . . age" required but-for causation under the Age Discrimination in Employment Act of 1967, *id.* at 176. The same logic applies to the anti-retaliation provision of the ADA. The provision uses the same language of "because." It specifically states that "No person shall discriminate against any individual *because* such

---

[17] The statutory provision in the Title VII context is the following: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because* he has opposed any practice made an unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

individual has opposed any act or practice made unlawful by this chapter or *because* such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a) (emphasis added).  There is no meaningful difference in the text or structure of the ADA's and Title VII's antiretaliation provisions such that the logic of *Nassar* would not also apply to the ADA provision.  The Second Circuit has described that provision as "substantially similar to the retaliation prohibition in Title VII" and has traditionally evaluated ADA retaliation claims under Title VII's framework.  *Sarno*, 183 F.3d at 159.  It follows, as numerous other courts in this Circuit have held, that but-for causation is required for ADA retaliation claims as well.  *See*, *e.g.*, *Mehta v. City of New York*, 2022 WL 280460, at *7 n.5 (E.D.N.Y. Jan. 31, 2022) (noting that the "but-for causation standard . . . applies with equal force to the causation standard for ADA retaliation claims"); *O'Hara v. Bd. of Coop. Educ. Servs., S. Westchester*, 2020 WL 1244474, at *15 (S.D.N.Y. Mar. 16, 2020) (stating that standards for Title VII and ADA retaliation claims are similar and "the ADA does not permit mixed-motive causation for retaliation-based claims" (citation and quotation marks omitted)); *Campbell v. N.Y.C. Transit Auth.*, 93 F. Supp. 3d 148, 174 (E.D.N.Y. 2015), *aff'd*, 662 F. App'x 57 (2d Cir. 2016) (citing caselaw concluding that ADA retaliation claims must also show but-for causation).

The Court also concludes that but-for causation applies to discrimination and retaliation claims under the NYSHRL.  The Second Circuit has also not addressed whether the but-for causation standard applies to NYSHRL discrimination and retaliation claims.  "The Circuit, however, has implicitly applied the but-for standard to NYSHRL claims on several occasions." *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 n.22 (S.D.N.Y. 2020).  In *Natofsky*, 921 F.3d 337, the Second Circuit held that because the ADA did not expressly provide

for a "motivating factor" test under its antidiscrimination provision, and because the phrase "on the basis of" was the equivalent of "because of," that only but-for causation applied under the logic of *Nassar* and *Gross*. *Id*. at 347–50.  The NYSHRL antidiscrimination provision also includes the language of "because" and omits any "motivating factor" language.  *See* N.Y. Exec. Law § 296(1)(a) ("It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . disability, . . . , to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.").  The logic of *Nassar*, *Gross*, and *Natofsky*, require that discrimination claims under the ADA and NYSHRL both require but-for causation.  That comports with decisions by other district courts in this Circuit. *See New York & Presbyterian Hosp.*, 440 F. Supp. 3d at 340 n.22 (stating that "District courts within this Circuit—including this Court—have also applied the but-for standard to NYSHRL claims" and citing cases).

Similarly, the Court concludes that but-for causation applies to NYSHRL retaliation claims.  The NYSHRL antiretaliation provision is substantially similar in text and structure to Title VII's and the ADA's antiretaliation provisions.  *See* N.Y. Exec. Law § 296(7) ("It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person *because* he or she has opposed any practices forbidden under this article or *because* he or she has filed a complaint, testified or assisted in any proceeding under this article." (emphasis added)).  And traditionally, the Second Circuit has stated that "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).  The Court agrees with the Honorable Chief Judge Margo Brodie

of the Eastern District of New York that "[s]ince the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*."  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 221 n.25 (E.D.N.Y. 2014).  Again, this comports with the general assumption and practice of district courts in this Circuit.  *See Figueroa v. KK Sub II, LLC*, 289 F. Supp. 3d 426, 441 (W.D.N.Y. 2018) ("[A] number of district courts in this circuit have used the *Nassar* [but-for causation] standard for NYSHRL retaliation claims.").

 However, "the NYCHRL does not require a plaintiff to show but-for causation.  Instead, 'summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision.'"  *Dodd*, 489 F. Supp. 3d at 269 (quoting *Mihalik*, 715 F.3d at 116); *see also Santiago v. ACACIA Network, Inc*., 2022 WL 6775835, at *8 (S.D.N.Y. Oct. 10, 2022) ("The 'higher but-for causation standard does not apply to NYCHRL retaliation claims.'"); *see also Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc., Emp. Benefit Funds*, 2021 WL 4851384, at *1 (2d Cir. Oct. 19, 2021) (summary order) (stating, in the context of discrimination claim on the basis of disability, that "[w]e have  . . . suggested that a plaintiff may prevail in a NYCHRL case if discrimination was a partial motivating factor").

The Court first discusses whether Plaintiff has proffered sufficient facts to create a triable issue on his ADA and NYSHRL claims.  It then turns to his NYCHRL claims.

It is undisputed that Defendants have met their burden of "articulat[ing]—but not prov[ing]" a "legitimate, non-discriminatory reason" that served as its but-for cause for discharging Plaintiff.  *See Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

Defendants have proffered evidence that Plaintiff was a poorly performing doctor who posed a risk to patients.  Defendants have an internal 97% threshold for success on its FPPE and Plaintiff's initial FPPE reported results below that threshold due to his 3b errors—determinations that should be made most of the time and are clinically significant.  Such errors included the brain hemorrhage miss and the bowel cancer overcall.  Dkt. No. 72 ¶ 156; Dkt. No. 60-34 (list of cases).  Additional errors included a misread of fluid in the pelvis of a young patient as normal, where the fluid was actually blood resulting from an internal injury; a failure to identify as abnormal a misplaced feeding tube that was in a patient's esophagus, rather than the patient's stomach; a report of fetal demise when the fetal age was less than necessary to confirm the heartbeat and the fetus was alive; two identifications of colitis when it was not present; failure to identify bilateral apical disease; a missed distal femoral fracture; and a misinterpreted perinephric hematoma.  Dkt. No. 72 ¶ 153; Dkt. No. 60-34.  Moreover, when confronted with those errors and offered the opportunity—albeit a challenging one—to work with his supervisors and to improve his performance over the next three months, Plaintiff did not fully acknowledge the errors or the need for corrective action.  He resisted the statements that he had made misses or that his "knowledge base" had a "deficit" in certain areas.  Dkt. No. 72 ¶ 162; Dkt. No. 60-18 (Plaintiff's contemporaneous notes of disagreement); Dkt. No. 69-1 at 114 (Plaintiff's testimony expressing disagreement on familiar cases); Dkt. No. 69-2 at 181–87 (Kantor's testimony of disagreement).

Plaintiff has not offered evidence from which a reasonable jury could find that those reasons from Defendants were pretextual.  First, although Plaintiff quarrels with the conclusions of the FPPE, that quarrel is not sufficient to create a genuine issue of material fact.   The universe of cases that were considered as part of the FPPE were compiled prior to the time Plaintiff had

made his request for an accommodation and those cases were reviewed before Plaintiff made his request for an accommodation.  That review was completed by March 10, 2020.   The review was conducted not just by Kantor but also by Grimm and Gold, who were not involved with his discharge.  *See Sotomayor*, 862 F. Supp. 2d at 259 ("A discriminatory inference can be rebutted when multiple evaluators all express dissatisfaction with the plaintiff's performance.").  The review indisputably established that Plaintiff's concurrence rate fell below the threshold that Kantor had established for passing the FPPE.  It also acknowledged comments made by those who observed Plaintiff's work prior to the request for an accommodation.  Again, Grimm, Gold, Toledano, and Arampulikan all relayed to Kantor their observations and reports of Plaintiff's errors and poor performance.  Dkt. No. 72 ¶ 119.  Gold told Kantor he wasn't "doing the protocols" or "dictating according to our protocol" and mentioned the "small bowel case."  Dkt. No. 60-5 at 66–67.  Toledano had stated to Kantor that he was "making more mistakes than [she] considered acceptable of . . . a more egregious severity and in a shorter period of time than . . . acceptable."  Dkt. No. 60-7 at 57.  Gold also informed Kantor about an error involving an identification of a misplaced feeding tube.  Dkt. No. 72 ¶ 147.

Plaintiff does not dispute that, when confronted with the review, he resisted Defendants' conclusions that he had knowledge-based deficiencies in his performance, but argues instead that the FPPE was inaccurate and cherry-picked to make Heiden "look bad."  Dkt. No. 73 at 25.  His evidence, however, consists for the most part solely of his own say-so.[18]  He has not offered

---

[18] Plaintiff only offers his own notes appended to the spreadsheet as evidence that he disagreed with the findings.  *See* Dkt. No. 69-28.  The statements are entirely conclusory.  They do not demonstrate either that Plaintiff correctly diagnosed the conditions he was observing or that the panel erred in its conclusion of the medical significance of Plaintiff's misses.  There is no evidence that they were shared contemporaneously with Defendants.  The notes state, for example—with respect to particular individual incidents, "Agree but not significant for trauma"

evidence that the facts upon which the panel acted were erroneous, much less that Kantor knew

or believed so at the time he reached the conclusion that Heiden was a risk and that he wanted

him removed from the hospital.  More important, Heiden has offered no evidence that

identification of the inaccuracies was the result of retaliatory or discriminatory intent.  Kantor

could have had no such intent because he was not aware of a request for an accommodation that

Heiden had not yet made.[19]  In the absence of such evidence, Plaintiff thus is left only with a

disagreement over performance—which manifestly is insufficient to give rise to a claim of

discrimination or retaliation.  *See Delaney v. Bank of Am. Corp*., 766 F.3d 163, 169 (2d Cir.

2014) (noting that the court does "not sit as a super-personnel department that reexamines an

entity's business decisions." (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997))); *see*

*Stewart v. Fashion Inst. of Tech*., 2020 WL 6712267, at *9 (S.D.N.Y. Nov. 16, 2020) ("An

employer can subject an employee to harsh and—in the minds of the recipient—unfounded

criticism without subjecting itself to a discrimination lawsuit."); *Williams v. N.Y.C. Dep't of*

*Sanitation*, 2001 WL 1154627, at *18 (S.D.N.Y. Sept. 28, 2001) ("[A c]ourt may not second-

guess an employer's non-discriminatory business decisions, regardless of their wisdom.")

(collecting cases).  "[I]t is well settled that the mere fact that an employee disagrees with an

employer's evaluation of that employee's misconduct or deficient performance, or even has

evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself,

---

for when the inaccuracy was listed as "bilateral apical disease not identified," "Disagree with no
colitis" when the discrepancy was "No evidence of colitis," and "Disagree-no fetal pole was
seen" for when the discrepancy was "Reported fetal demise with fetal age less than necessary to
confirm heartbeat.  Live fetus."  *Id*.  No additional details are provided.  Those statements
provide no proof of otherwise objective and verifiable outcomes.  Plaintiff has offered no expert
testimony or other evidence confirming that his review of the cases was, in fact, correct.
[19] Kantor was aware that Heiden had ulcerative colitis.  There is no evidence or contention that
he acted adversely towards Heiden as a result of that condition.

that the employer's proffered reasons are a pretext for termination." *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008), *aff'd*, 360 F. App'x 214 (2d Cir. 2010). "It is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister*, 859 F.2d at 1116.

There is no other evidence, each of which is reviewed here, that would show that Defendants' reasons were pretextual.

### 1. Discriminatory Comments

It is undisputed that no discriminatory comments were made.[20]

### 2. Timing

The timing of Defendants' actions undermines Plaintiff's argument that Kantor's proffered reasons for asking Plaintiff to resign were pretextual. Temporal proximity alone cannot establish that the reason for an adverse action was pretextual when the basis for that action preceded the adverse action. Although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation," *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see, e.g., Gonzalez v. NYU Langone Hosps.*, 2022 WL 4372199, at *2 (2d Cir. Sept. 22, 2022) ("Gonzalez's extensive history of performance issues and ongoing discipline dating back to 2010—long before her protected activity in 2016—prevent her from establishing an indirect causal connection."). Were it

---

[20] Plaintiff testified that timing was the only reason he thought his discharge was retaliatory. *See* Dkt. No. 69-1 at 124 ("Q: Yes or no, is timing the only reason that you think this is retaliatory? A. Yes.").

otherwise, an employee concerned about the risk of an adverse action could forestall the action—and effectively hamstring his employer—with an artfully timed request for accommodation or complaint about discrimination.  *See Donathan v. Oakley Grain, Inc.,* 861 F.3d 735, 742 (8th Cir. 2017) (expressing "an inclination to discount temporal proximity due to the perceived risk that employees who anticipate discipline or adverse actions might preemptively engage in protected conduct to complicate or forestall such discipline or to set the stage for later retaliation claims"); *see also Nassar*, 570 U.S. at 358 ("Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance . . . . To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation."); *Breeden*, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").  Thus, temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013); *see also Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) (same).

The chronology of events is inconsistent with the proposition that Defendants' proffered reasons for the adverse action—that Plaintiff had knowledge-based deficiencies that he refused to recognize—were pretextual.  Plaintiff's adverse job actions began well before he submitted his accommodation request on March 22, 2020.  Defendants had begun the FPPE process in January with an increased focus on certain tasks due an RCA resulting from Plaintiff's missed brain hemorrhage diagnosis, Dkt. No. 72 ¶ 62, and Defendants received the results of his FPPE by March 2 to March 10, 2020, *id.* ¶ 81.  Those results showed indisputably that Plaintiff's

concurrence rate fell below the threshold that Kantor had established for passing the FPPE and that he had knowledge-based deficiencies.  Other physicians had expressed concerns to Kantor about Plaintiff's performance before the accommodation request.  *Id*. ¶ 118; Dkt. No. 69-2 at 123–29.

Plaintiff made his request for an accommodation to Kantor on March 22, 2020.  In the immediate aftermath of that request—and even in the face of it—Kantor did not suggest that any adverse employment action be taken against Plaintiff.  To the contrary, Kantor suggested that Plaintiff be informed of his errors and that he be encouraged to participate in a multi-month review process to address those errors, as reflected by the email Kantor sent to HR on March 23, 2020 proposing a multi-month review plan:

> I believe, even in light of our previous discussion that I need to discuss with him the need to improve his performance and how we might help him do so and that we will reevaluate over the next few months.  Does this sound like a reasonable approach?

Dkt. No. 72 ¶ 101 (emphasis added).[21]  That it was Kantor's original intent that Plaintiff continue at Lincoln even after receiving the request for accommodation is further corroborated by Kantor's notes on the FPPE Evaluation form indicating that Plaintiff had a three-month improvement period on March 24, 2020.  Dkt. No. 60-33.  Although Kantor informed Plaintiff of his views that at the end of the day, it would be "very unlikely" that Plaintiff would be able to satisfy Kantor and Lincoln, it is undisputed that Plaintiff was offered the opportunity.

---

[21] Negative performance evaluations do not constitute adverse employment actions on their own and thus would not support a claim for a constructive discharge.  *See Bernstein v. New York City Dep't of Educ.*, 2020 WL 6564809, at *6 (S.D.N.Y. Nov. 9, 2020) ("Whether deserved or not, however, the disciplinary notice and disciplinary letters cannot constitute adverse employment acts on the basis of age on their own.") (citing cases); *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 216 (E.D.N.Y. 2014) ("Even under the NYCHRL , . . .  negative evaluations, . . . do not rise to the level of an adverse employment action.").  The constructive discharge occurred when Kantor confronted Heiden with a take-it-or-leave-it offer: resign or Kantor would recommend termination with cause.

It also is undisputed that Kantor did not express his desire that Plaintiff resign until March 26, 2020, *after* having offered Plaintiff the prospect of a multi-month improvement plan on March 24 and March 25, 2020 and *after* Kantor had reached the conclusion that Plaintiff was not receptive to the criticism and that a multi-month improvement plan with a doctor who failed to acknowledge his errors would not be fruitful.  Indeed, there is no evidence that Kantor made any comments to Plaintiff about the request for an accommodation after March 22, 2020 or that his reasons for stating the view that Plaintiff should resign had anything to do with his request for an accommodation.  Thus, the timing does not support that the proffered reason for Defendants' adverse action was anything other than its but-for cause and that Plaintiff was discharged because of his request for an accommodation.  Had Plaintiff accepted the results of the review when he was first confronted with it, he would have continued to be employed notwithstanding the request for an accommodation.

Plaintiff marshals three other reasons for showing pretext: comparative evidence, procedural irregularities, and evidence of other purported inconsistencies.  None of them show an inference of discrimination or retaliation.  Thus, even if Plaintiff's timing argument was correct, it alone cannot sustain his ADA and NYSHRL claims.

### 3.    Substantial Similarity

Plaintiff argues that there was "comparative evidence" of disparate treatment that shows an inference of discrimination or retaliation.  He contends that other radiologists had misses and that he was not the worst performer, focusing in particular on Amer.  Dkt. No. 73 at 27–29. Defendants contend that Plaintiff compares "apples to oranges" because he does not establish

whether they were probationary and had different supervisors.  Dkt. No. 86 at 8–10.[22]  Plaintiff

has not met his burden of showing pretext on the basis of "comparative evidence."

"A showing that similarly situated employees [outside the protected group] received

more favorable treatment can also serve as evidence that the employer's proffered legitimate,

non-discriminatory reason for the adverse job action was a pretext for . . . discrimination."

*Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000).  An employee is similarly situated

to other employees if they were (1) "subject to the same performance evaluation and discipline

standards" and (2) "engaged in comparable conduct."  *Id.* at 40.  The employee must be similarly

situated "in all material respects," *id.* at 39, and the comparison requires "a reasonably close

resemblance of facts and circumstances," *id.* at 40.  "A proposed comparator is not similarly

situated unless she engaged in all of the same misconduct as plaintiff, or at least committed the

most serious infractions for which the plaintiff was subjected to an adverse employment action."

*Hamilton v. DeGennaro*, 2019 WL 6307200, at *11 (S.D.N.Y. Nov. 25, 2019); *see also*

*Marseille v. Mount Sinai Health Sys.*, Inc., 2021 WL 3475620, at *6 (S.D.N.Y. Aug. 5, 2021),

---

[22] Defendants argue that "plaintiff must either present direct evidence reflecting discriminatory animus toward people with disabilities or circumstantial evidence that similarly situated non-disabled employees were treated differently than he was."  Dkt. No. 86 at 8.  That is not the law. Plaintiff is not required to show that similarly situated employees were treated differently than him in the absence of direct evidence of animus.  Treatment of similarly situated employees is simply one factor among many that may give rise to an inference of discriminatory or retaliatory intent.  *See Natofsky*, 921 F.3d at 353 (describing it as a factor for retaliation claims); *Chambers*, 43 F.3d at 37 (discrimination claims).  Such evidence is not a requirement.  Neither of the cases cited by Defendants indicate otherwise.  *See Miller v. City of New York*, 2018 WL 2059841, at *8 (S.D.N.Y. May 1, 2018) (identifying the requirement of comparators for a *disparate pay* claim); *Moore v. Consol. Edison Co. of NY*, 2007 WL 831807, at *10 (S.D.N.Y. Mar. 20, 2007) (first noting that "there is no unbending or rigid rule about what circumstances allow an inference of discrimination" and stating that "special circumstances," in addition to "discriminatory animus" and "treatment of any similarly situated employees" can suggest discrimination (internal quotation marks and citation omitted)).  Thus, the Court does not treat this standard as a necessary requirement for showing an inference of discrimination or retaliation.

*aff'd sub nom. Marseille v. Mount Sinai Hosp.*, 2022 WL 14700981 (2d Cir. Oct. 26, 2022)

(discussing requirement of evidence that comparators are substantially similar under NYCHRL).

Plaintiff fails to "proffer any evidence that similarly situated non-disabled employees

were similarly cited for poor performance and received more favorable treatment." Dkt. No. 66

at 13; Dkt. No. 86 at 8–11.  Plaintiff was a probationary employee.  During his probation period,

he was subject to an RCA after having missed a brain hemorrhage that led to the patient falling

and hitting his head.  That RCA led to an increased focus on cross-sectional imaging during his

FPPE.  Dkt. No. 72 ¶ 72.  Before and during his FPPE, numerous doctors—Grimm, Gold,

Toledano, and Arampulikan—expressed complaints to Kantor about his reading of imagery.

Toledano stated that he was "making more mistakes than [she] considered acceptable of . . . a

more egregious severity and in a shorter period of time than . . . acceptable."  Dkt. No. 60-7 at

57; *see also* Dkt. No. 60-5 at 64–65 (Grimm); Dkt. No. 72 ¶ 119.  Before his FPPE review

concluded, Plaintiff had one incident in which he over-diagnosed bowel cancer, which nearly led

to an unnecessary biopsy, and another incident which misidentified the location of a feeding

tube.  *See supra* Section II.A–C.  It is further undisputed that the FPPE, with the increased focus

on cross-section imagery, resulted in a concurrence percentage of 93.8%, below the 97%

concurrence threshold.  *Id.* ¶ 112.  That result arose from eleven cases where he had made

category "3b" errors out of over 200 cases from November 2019 to February 2020, with the B

signifying that they were "clinically significant" because such errors negatively affected the

patient's care.  *Id.* ¶¶ 111, 114.  When he was confronted with these results, he resisted the

conclusions.  *See generally supra* Section II.D.

Plaintiff has failed to identify a similarly situated comparator.  He focuses primarily on

Amer whom he argues had twelve category 3 errors during the period of September 12, 2019 to

March 12, 2020.  But Amer is not similarly situated for several reasons.  First, the record is bereft of evidence regarding whether Amer's errors were category 3a errors (meaning that they were not clinically significant) or category 3b errors (meaning that they were clinically significant).  During that same time period Plaintiff had ten category 3b errors.  The difference is consequential.  A clinically-significant miss indicates that the mistake had negative effects for the patient's medical treatment.  A category 3a error does not have that significance.  Plaintiff is comparing apples to oranges.

Moreover, there is no evidence that Amer's errors—like Plaintiff's—were knowledge-based.  The difference again is significant.  A "knowledge-based problem" is one in which the doctor was able to identify something, but "did not know how to evaluate it, didn't know why that was abnormal."  Dkt. No. 69-2 at 177 (Kantor's testimony on how Plaintiff recognized there was a significant amount of fluid in pelvis of a patient, but didn't know it was "not normal"); *id.* at 177–78 (Kantor describing an instance where Plaintiff didn't recognize a feeding tube was in wrong location that would have led to the inhaling of food).  That is distinct from mere perceptual error or "eyeball misses."  *Id.* at 176.  A knowledge-based deficit, as opposed to mere perceptual error, indicates that the doctor needs to "learn" and "accept that these things were things he didn't know and improve his knowledge base."  *Id.* at 174.

There also is no evidence that Amer was a probationary employee not entitled to just cause in the event of termination.  In fact, Plaintiff described Amer as a "senior radiologist." Dkt. No. 69-1 at 144.  By definition, he was not similarly situated to Plaintiff who had no rights to remain at the hospital.  *See Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004) (holding that a probationary employee was not similarly situated to the other employees as to discharge); *see also Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008)

(distinguishing probationary and tenured employees).  Moreover, although there is some

evidence that Amer was subject to an RCA "years ago," before Kantor was the chief, there is no

evidence regarding its result, that it was clinically significant, or that it led to a subsequent FPPE

or influenced an initial FPPE.  *See* Dkt. No. 69-5 at 49; *see also Brown v. Waterbury Bd. of

Educ.*, 247 F. Supp. 3d 196, 209 (D. Conn. 2017) (stating that "[c]ourts have held that where

employees are disciplined by different supervisors, they are not similarly situated" and citing

cases).  There is no evidence that Amer had received the critical comments regarding his

performance that Plaintiff received.

 None of the other comparators was remotely in Plaintiff's position.  Plaintiff also

identifies Drs. Husayn Al-Husayni and Wayne Gulston, each of whom had one category 3 miss

during the period September 12, 2019 to March 12, 2020 when Plaintiff had ten, Dkt. No. 73 at

9; Dkt. No. 72 ¶ 320, had one during a partially overlapping time period of March 2, 2020 to

April 1, 2020, when Plaintiff also had one, Dkt. No. 69-14, and had two from April 1 to May 1,

2020, in the period after Plaintiff's employment.  Not only are the number of misses not similar

to those for Plaintiff but there is once again no evidence that any of the misses by those doctors

was clinically significant.  Nor is there evidence that any was subject to an RCA, that any of

them had knowledge-based errors, or that any fell below the threshold of 97% for an FPPE.

 Although Grimm testified that other doctors, including Drs. Caroline Hwang and

Muppidi, would occasionally report to Grimm that one of their colleagues had missed a case, she

could not identify who those colleagues were.  Dkt. No. 69-6 at 80, 83–85 (Grimm testifying that

she could not "remember which one of [her] colleagues did the initial read that was missed"); *id.*

at 86 (stating that "sometimes it's not always ours, cases get sent out to the virtual radiology

company, so a lot of times, their reads—I don't even know who they are, so I couldn't

remember"). She does not identify how many of these misses were clinically significant or the difficulty of the diagnoses (*i.e.*, whether they are categorized as 2 or 3), except to say that "as a caveat, they're not all major, sometimes they're subtle or . . . not clinical significant." *Id.* at 87– 89. Grimm's testimony provides no basis for determining the substantially similar nature of any physician at Lincoln.

In addition, the act of permitting other radiologists to work remotely cannot give rise to an inference of discrimination because the circumstances of the remote-work physicians differed. Kantor testified, and it is undisputed, that the other physicians specialized in different expertise and were of the variety that needed to be "covered absolutely" in the case of COVID-19. Dkt. No. 69-2 at 74. Kantor issued those workstations to Gold, a specialist in neuroradiology, Amin, a specialist in pediatric radiology, Toledano, a specialist in musculoskeletal radiology, and Grimm, a specialist in body imaging radiology. Dkt. No. 72 ¶ 93. Plaintiff does not identify any information that he overlapped in role or was treated as a specialist in any of these fields. It is undisputed that those doctors were granted access to remote stations on a temporary basis only to make up shifts and were not granted the full-time access that Plaintiff sought. Dkt. No. 72 ¶¶ 94–95. Plaintiff has adduced no evidence that his circumstances were similar to those of these physicians, including his probationary status. Similarly, Plaintiff has adduced no evidence about their disability status.

### 4.    Procedural Irregularity

Plaintiff argues that there were procedural irregularities with his discharge that raise an inference of discrimination or retaliation. Dkt. No. 26. He maintains that there was a "progressive disciplinary policy" which requires "multi-level review by administrators" and a "performance plan." *Id.* at 26–27. The evidence construed favorably to Plaintiff does not support his claim.

"Departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984); *see also Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (same); *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 314 (2d Cir. 1997) (identifying "deviat[ion] from . . . *normal decisionmaking procedures*" as an indicator of pretext (emphasis added)).  However, "a failure to follow *established company policies* [must] be coupled with other evidence of pretext before denying motions for summary judgment. . . . [A] plaintiff must show more than mere deviation to survive summary judgment." *Almodovar v. Cross Fin. Corp.*, 2022 WL 1810132, at *7 (D. Conn. June 2, 2022) (emphasis added); *see also Riccobono v. Crew*, 2010 WL 11602749, at *10 (E.D.N.Y. Sept. 10, 2010) (same).

Plaintiff has failed to proffer evidence from which a jury could find that there were procedural irregularities in Defendants' conduct.  There is no genuine issue of fact that Plaintiff was a probationary employee subject to termination without cause.  Dkt. No. 72 ¶¶ 36, 41. Plaintiff was appointed on or about October 1, 2019 and the probationary period is one year under the Collective Bargaining Agreement, Dkt. No. 60-11 at ECF p. 2.  Thus, Plaintiff was a probationary employee within the meaning of the Collective Bargaining Agreement at the time of the events.  Dkt. No. 72 ¶¶ 36, 41.  The Collective Bargaining Agreement states that after the probationary period for new employees, employees "shall be subject to termination or other discipline only where the Employer can demonstrate just cause for such action."  Dkt. No. 60-11. The Collective Bargaining Agreement did not hold Defendants to a "just cause" standard and does not form a basis of departure from procedure.

Instead, Plaintiff relies on the testimony of Gold, Kantor, Ravenel, and a document titled "Article II, Medical Staff Membership" to assert that there was a progressive discipline policy

that would allow for a multi-month performance improvement period.  *See*, *e.g.*, Dkt. No. 72 ¶¶ 405–14.  None of that evidence is sufficient to create a genuine issue of fact.  Gold testified he believed there would be some sort of "rights to some kind of a hearing or process before you were disciplined or fired," as well as an "opportunity to be heard" for union employees, but he then added that "[t]here's a difference between me and what Dr. Heiden was" in that "[t]here is a probationary period when you're first hired."  Dkt. No. 69-5 at 52–53.  He then stated that "I think that you're more, you know, it's just—I don't know if the union didn't kick in yet or I don't know exactly what the difference is."  *Id*. at 53.  Gold's testimony thus does not establish a progressive discipline policy for probationary employees.  If anything, he testified that probationary employees have different protections than permanent employees and that he did not know what that difference was.

Plaintiff also cites Ravenel's testimony for the proposition that Lincoln had a "progressive discipline" policy.  Dkt. No. 72 ¶ 406.  But Ravenel does not describe "processes for disciplining or firing physicians," Dkt. No. 69-4 at 26, in the context of probationary employees.  She testified that "most of the physicians are covered by the union, so we have to follow the union contract, and most of the time it involves progressive discipline."  *Id*.  But the collective bargaining arrangement for the union excludes probationary employees from such protection:  it does not include "just cause for" "termination or other discipline."  Dkt. No. 60-11.  The procedures that Ravenel describes do not apply to Plaintiff as a probationary employee.

The procedures also do not apply to Plaintiff for another reason: Ravenel testified that "[w]hen it comes to the health and safety and the physicians, that's usually something that's different by the medical bylaws, it's not so much an HR-related matter.  If it's medically related, it's usually handled on the medical side of, you know, the hospital, not HR."  Dkt. No. 69-4 at

28–29.  She then further stated that "[s]o if he had risks that were medical related, like say his

cases or something, it's not something that would have come through HR, it would have through

. . . the medical office."  Although "[t]hey wouldn't just keep [HR] in the dark" and would

"notif[y them] if there were issues with [t]he person's employment status," "the actual decision

would be made on the medical side following the applicable bylaws."  *Id.* at 29.  Ravenel's

testimony thus does not describe the disciplinary process for medical issues, let alone one for

medical issues involving probationary employees.  Ravenel testified that issues involving "cases"

and "health and safety" were addressed by "separate bylaws that govern physician conduct," *id.*,

and were not generally addressed by HR until there was an issue with the physician's

employment status.  Ravenel only confirms that any such physicians would be subject to medical

bylaws for care-related issues, not the progressive discipline imposed by HR.

That leaves the testimony of Kantor himself.  Kantor testified that as part of an initial

FPPE evaluation, he would first "review cases" with the radiologist, which "may take more than

one day."  Dkt. No. 69-2 at 97–98.[23]  But after "review with the clinician," the "options for next

---

[23] Heiden also argues that Kantor "would not permit Heiden to even discuss the alleged
deficiencies," Dkt. No. 73 at 27, citing Heiden's testimony that he "didn't have a chance to"
"express [his] disagreement," Dkt. No. 69-1 at 114.  But nothing in Kantor's testimony indicates
that his hypothetical initial FPPE procedure allowed a probationary employee to debate the
conclusions reached by his supervisor and other doctors regarding missed cases.  Kantor merely
testified that he would "go over the cases individually," but "[n]ot necessarily all the cases," and
there is no testimony that the procedure was to allow the reviewed physician to challenge the
tally.  Dkt. No. 69-2 at 98–99.  Moreover, Heiden testified that Kantor indeed reviewed some of
the cases with Heiden.  Kantor provided a spreadsheet of the cases.  Heiden testified that Kantor
volunteered patient outcomes for the allegedly inaccurate cases.  More specifically, "there was
one case that omental thickening which he didn't think was correct.  There was a case a fracture
of the knee which he thought was subtle, he told me that a number of times.  There was a case of
subarachnoid hemorrhage also he told me it was subtle."  Dkt. No. 69-1 at 120.  And although
Article II describes that "[t]he FPPE panel will consider minority opinions and the views of the
practitioner in review," that description was only for a "Subsequent FPPE" and not an "Initial
FPPE," which Plaintiff contends was the category of his FPPE.  Dkt. No. 69-18 at 33–34.

steps" would "depend[] on what the results of th[e review] were exactly." *Id*. at 99.  Kantor then

testified to the following:

> Q. Are there circumstances in which you would not give someone a chance?
>
> . . .
>
> A. I know what you're asking. I'm just thinking about are there specific times when I would not go over that? If someone lost their vision and couldn't see, I don't think there would be a plan that would work, so I wouldn't. Most times are -- any times I can think of, like I said, I've never gotten this far with too many people. As a matter of fact, just one. I would usually try to implement a plan that would allow somebody to improve their performance, yes. That would be the initial plan.
>
> Q. And in every situation that you can recall doing this, you have initiated such a plan; correct?
>
> A. *I've only done this once*.
>
> Q. *Dr. Heiden*?
>
> A. *Correct*.

Dkt. No. 69-2 at 101 (emphasis added).  He further clarified that offering such a plan is based on

"knowing what [he] would do, knowing [himself]," rather than any formalized policy or

procedure:

> Q. If you determine that you didn't want that person, that radiologist, because of the FPPE, you would then make a recommendation to terminate that person's privileges?
>
> A. If on the basis of that -- what you're saying is the FPPE alone, I would usually before doing that come up with some sort of – *this happened once. But knowing what I would do, knowing me*, come up with some sort of plan to give somebody a chance to -- redeem themselves is not the right word, but improve themselves and do it again in a few months.

*Id*. at 102.  Kantor further emphasized this point in another exchange:

---

Finally, even if the regular procedure permitted a probationary employee to debate the conclusions reached by his supervisor and the FPPE panel, Heiden was afforded that opportunity.  He simply did not take advantage of it.  *See id.* at 121 ("Q. Did you say anything in response to this? A. I was very shaken. I didn't say much of anything.  I was devastated.").

Q. But it's your practice to give the radiologist you supervise a chance at a review several months later; correct?

A. *Considering I have only done this once, I don't know if I can say what my practice is. You asked me what I think I would do, I told you. My practice is -- tough to say when in 20 years of being a chief I've only gotten to this position once.*

*Id.* at 106 (emphasis added).

Read in context, then, Kantor's testimony does not establish that he departed from an established policy.  It establishes that there was no policy.  Knowing himself, when confronted with a situation where he did not want to continue employing a radiologist due to poor FPPE results, Kantor would give that radiologist the opportunity to redeem himself or herself.  But that happened only once, and it was in the case of Plaintiff.  No reasonable jury could conclude that Kantor departed from any "policy" in the case of Plaintiff.  And in the case of Plaintiff, Kantor *did* do for Plaintiff what he speculated he would do: he gave Plaintiff the opportunity to redeem himself noting that if Plaintiff took that opportunity he might not succeed.  It was when Plaintiff did not recognize the full extent of his errors that Kantor expressed the view that he did not want to give Plaintiff additional time and wanted him to resign.[24]

Finally, Plaintiff argues that a document entitled "Article II, Medical Staff Membership" that appears to outline the internal procedures for applications for privileges and appointment to the Medical Staff requires a doctor to be given the opportunity for multi-level review by

---

[24] Kantor's testimony is also inadmissible because it is pure speculation divorced from his experience.  Defendants objected to this testimony during the deposition for good reason.  *See* Dkt. No. 69-2 at 102–03.  Kantor has never dealt with this situation outside of Plaintiff.  Thus proffering his testimony as evidence of an "established company policy" is inadmissible because as a lay witness, his testimony is not based in "observation or other first-hand knowledge" of any company policy.  *United States v. Graham*, 2019 WL 2366724, at *8 (S.D.N.Y. May 31, 2019), *aff'd*, 51 F.4th 67 (2d Cir. 2022) ("Lay witnesses may not speculate in their answers to questions posed and their testimony must be grounded in observation or other first-hand knowledge; their opinions may not be based on speculation, intuition, rumors or matters remote from their experience.").  Kantor is speculating on how he *would have* dealt with others who would have failed the FPPE—something that he explicitly states has never otherwise occurred.

administrators following poor performance.  *See* Dkt. No. 73-2 at 26 (citing Dkt. No. 69-18).

Dkt. No. 69-18 ("Article II document").  That document indicates that the "Executive Director

may at any time, upon the recommendations of the Chief of Service, the President of Medical

Staff, or the Chief Medical Officer, terminate a practitioner's temporary clinical privileges."  *Id.*

at 30.  That document does not establish a departure from procedures.[25]  In his communications

with Plaintiff, Kantor stated that in the absence of his resignation, he would "take it further" or

"take it upstairs."  *See* Dkt. No. 72 ¶ 168.  There was no occasion for Kantor to do so because

Plaintiff chose to resign.

### 5.   Other Evidence of Inconsistencies

Plaintiff's remaining arguments that Defendants' proffered rationale is mere pretext are

not persuasive.  Plaintiff argues that internal documents reveal there was no "cause to report"

Plaintiff despite Kantor's threat to report Plaintiff to the OPMC.  Dkt. No. 73 at 24.  That

argument has the sequencing backwards—there was no "cause to report" because Kantor had not

yet sought to escalate and terminate Plaintiff for cause.  Kantor, according to Plaintiff's version

of events, was threatening to terminate him with cause.  Dkt. No. 72 ¶ 351.  That termination

with cause would lead to a "cause to report" to the OPMC that Plaintiff believed could pose a

threat to his license.  *Id.* ¶ 353.[26]  The record evidence showed that Lincoln's HR had internally

reported that there was no "cause to report" occurred before Kantor had sought to terminate

Plaintiff for cause.

---

[25] The document only relates to privileges, and not to employment.  They establish no regular
procedure for how a physician's employment could be terminated and thus do not make Kantor's
constructive discharge improper.

[26] Plaintiff testified at deposition that a report to OPMC would result in an investigation and that
he "might" lose his license as a result of that investigation.  Dkt. No. 69-1 at 80.

The Court also agrees that with Defendants that Plaintiff's arguments concerning the RCA and the FPPE are non-sequiturs.  Plaintiff emphasizes that neither are disciplinary events in and of themselves.  But Kantor's reliance on Plaintiff's RCA or FPPE results as the basis for seeking termination for cause is not pretextual; that they themselves are not disciplinary events do not prevent their results from justifying a disciplinary action or a constructive discharge.  Plaintiff identifies no reason why such consideration would be improper or pretextual or a deviation from proper procedure.  Here, it is undisputed that the RCA recommended an increased focus on cross-sectional imaging in the FPPE.  Dkt. No. 72 ¶ 72.  It is further undisputed that the FPPE, with the increased focus on cross-section imagery, resulted in a below 97% score for Plaintiff.  *Id.* ¶ 112.  That below 97% score, even if not itself a disciplinary action, could establish the basis for a decision on termination.  That the RCA's section on reporting the practitioner to the OPMC is blank is also a nonsequiter.  That they chose to not report to the OPMC based on the RCA has no implication for whether they may effectuate a later disciplinary decision based on the underlying events reflected in the RCA and the FPPE.

### C.      NYCHRL Discrimination and Retaliation Claims

Courts "must analyze NYCHRL claims separately and independently from any federal and state law claims" and must construe NYCHRL provisions broadly and in favor of the plaintiff.  *Mihalik*, 715 F.3d at 109.  A plaintiff may "prevail in an action under the NYCHRL if he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision."  *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40 (1st Dep't 2012); *see also Hamburg v. New York Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 32 (1st Dep't 2017) (same).  Similarly, for the purposes of Plaintiff's retaliation claims, "summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision."  *Mihalik*, 715 F.3d at 116.  It follows that

it is insufficient for a defendant to obtain summary judgment on a NYCHRL claim to show that it had a legitimate non-discriminatory or non-retaliatory reason for the adverse action.  Even if Plaintiff cannot "prove that the reason proffered by the employer for the challenged action was actually false or entirely irrelevant," a plaintiff can forestall summary judgment on a NYCHRL claim by proffering evidence to raise an issue of fact that the action was motivated at least in part by discrimination.  *Melman*, at 946 N.Y.S.2d at 40–41.

Plaintiff has presented evidence here that—even though he would have kept his job had he not made knowledge-based errors and had he been receptive to Kantor's criticisms—could reasonably support the conclusion that those factors were not the only cause for the adverse action.  In particular, a reasonable jury could find that, having given Kantor a legitimate reason for asking Plaintiff to resign based on the facts of the FPPE and the conversations on March 24 and 25, Kantor then recognized that Plaintiff's resignation could kill two birds with one stone—it would eliminate from the staff a doctor who had caused health-related problems and was not receptive to curing them *and* it would eliminate any need for Defendants to find an accommodation for Plaintiff's disability.  Such a finding would not be purely speculative. Kantor had not always planned to ask for Plaintiff's resignation based on the results of the FPPE completed on March 10, 2020—the decision to ask for that resignation arose shortly after the request for the accommodation.  And, there is evidence from which the jury could find that Kantor was not receptive to making the accommodation.  He initially indicated to Fisher on March 23, 2020 that the "limited number of workstations for Radiologists to work from home" would not be "immediately available" and that "Heiden's skill set does not meet the criteria for the initial installations."  Dkt. No. 69-27.  There also is evidence that Kantor was pleased with Plaintiff's resignation and recognized that it solved a problem for him with the request for an

accommodation.  Kantor emailed Fisher on April 2, 2020, forwarding Plaintiff's resignation

email, with the message that the "Problem we discussed earlier is no longer an issue."  Dkt. No.

69-54.  A jury could reasonably conclude that that the "problem" mentioned in that email was

the problem of the request for accommodation and that it was solved by Plaintiff's agreement

under pressure to resign.  Although there is evidence that cuts the other way, including Kantor's

testimony that he did not think about the request and that the decision to ask Plaintiff to resign

was not related to the accommodation request, Plaintiff has put forward enough evidence for a

jury to find that even if the accommodation request was not the but-for cause of the request to

Plaintiff to resign, it played a part—albeit perhaps minor—in the decision to ask for the

resignation.

## II.    Failure to Accommodate

Plaintiff also argues that Defendants failed to provide reasonable accommodation under

the ADA, NYSHRL, and NYCHRL.  Defendants contend that the accommodation requested was

unreasonable.  Although it may be that Plaintiff did not suffer damages as a result of the failure

to accommodate, the Court denies summary judgment as to these claims.[27]

Discrimination includes failing to provide a reasonable accommodation for a disability.

"In so-called reasonable-accommodation cases . . . , the plaintiff's burden 'requires a showing

that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer

covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff

could perform the essential functions of the job at issue; and (4) the employer has refused to

---

[27] Plaintiff does not claim that this is a case in which the failure to provide accommodation led to
performance deficiencies that inevitably resulted in his termination.  *Cf. Natofsky*, 921 F.3d 337.
The record shows that Defendants did not force Plaintiff to resign from his job by threatening his
health; they forced him to resign by threatening firing with cause, which had no relation to his
disability or accommodation. *Cf. Goldman*, 2022 WL 6564021, at *11 (S.D.N.Y. Aug. 5, 2022),
*report and recommendation adopted*, 2022 WL 4482296 (S.D.N.Y. Sept. 27, 2022).

make such accommodations.'"  *Graves*, 457 F.3d at 184 (quoting *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)); *see also Casmento v. Volmar Constr., Inc.*, 2022 WL 15773966, at *5 (S.D.N.Y. Oct. 28, 2022) (describing equivalent caselaw for NYSHRL and NYCHRL); *Nieblas-Love*, 165 F. Supp. 3d at 73 (citing cases).  "[T]he NYCHRL . . . defines 'reasonable accommodation' more broadly than the ADA and the NYSHRL to be any 'such accommodation that can be made that shall not cause undue hardship in the conduct of the [employer's] business.'"  *Id*. at 74 (quoting NYCHRL § 8-102(18)).

## A.      Reasonableness of the Accommodation

Defendants do not dispute, for purposes of summary judgment, that there is a genuine issue of fact with respect to three of the prongs of the reasonable accommodation test: (1) Plaintiffs had a disability within the meaning of the ADA; (2) Defendants had notice of that disability; and (3) Defendants refused to make an accommodation for Plaintiff's disability. Defendants focus their request for summary judgment on the third prong—that with a reasonable accommodation, Plaintiff could perform the essential functions of the job at issue.  Defendants argue essentially that Kantor believed (with reason) that, with or without the accommodation, Plaintiff was unable to perform the essential functions of the job at issue.  Dkt. No. 86 at 4. Defendants argue, "assuming for the purposes of this motion that Plaintiff's accommodation request was denied, it was on the basis of Dr. Kantor's concerns about Plaintiff's ability to perform the essential functions of his job."  Dkt. No. 66 at 14.  As they put it in their reply brief, because of Plaintiff's failure to meet the 97 percent concurrence rate to safely perform his clinical responsibilities, he "is not otherwise qualified, and this is because he is unable, with or without assistance, to perform the essential function of the job in question."  Dkt. No. 86 at 2. Defendants' argument misses the mark.

The third element of the failure-to-accommodate claim does not turn upon whether the defendant has a good faith belief that the plaintiff can perform the essential functions of his job. It does not "require proof of discriminatory intent." *Brooklyn Ctr. for Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co.*, 955 F.3d 305, 312 (2d Cir. 2020) (citing *Austin v. Town of Farmington*, 826 F.3d 622, 629 (2d Cir. 2016)). Failure-to-accommodate claims are not assessed under the *McDonnell Douglas* framework, which expressly shifts burdens to determine a defendant's intent. *See Nazario v. Promed Pers. Servs. NY Inc.*, 2017 WL 2664202, at *5 n.1 (S.D.N.Y. June 19, 2017). Rather, it requires the defendant to accommodate the request for an accommodation unless that accommodation is "unreasonable or would cause undue hardship." *Id*. Thus, even assuming that Kantor believed in good faith that Plaintiff would not be able to perform the essential functions of his job with an accommodation (a conclusion regarding Kantor's intent the Court has reached in connection with Plaintiff's discrimination and retaliation claims), that would not excuse Defendants' failure to make an accommodation if, in fact, Plaintiff was able to perform the essential functions of his job with an accommodation. *See Graves*, 457 F.3d at 184 (noting that to succeed on a failure to accommodate claim, Plaintiff must show that, *inter alia*, "with reasonable accommodation, plaintiff could perform the essential functions of the job at issue" (citation omitted)).

Plaintiff has offered evidence from which a jury could conclude that he was able to perform the essential functions of his job, notwithstanding Kantor's good-faith belief to the contrary. *See supra* Section I.A.2. It follows therefore that Defendants cannot defeat summary judgment on the failure-to-accommodate claim by the assertion that Plaintiff could not perform the essential functions of his job with or without an accommodation. Defendants must show that, even if Plaintiff would otherwise have been capable of performing the essential functions of

his job, granting him the accommodation rendered him incapable of performing those essential functions.

Defendants fail to demonstrate the absence of a genuine issue of fact that with reasonable accommodation, Plaintiff would have been unable to perform the essential functions of the job at issue for the limited period of time between the making of the request for an accommodation and Plaintiff's resignation.  There is evidence in the record showing that Defendants purchased more remote workstations for the staff.  Dkt. No. 72 ¶¶ 265–66.  There is also evidence that staff at Lincoln had begun working remotely and Kantor allowed for some of the radiologists in his department to work remotely on a part-time basis.  *Id.* ¶ 88.  There further is evidence that Plaintiff offered to pay for the workstation himself, blunting any undue hardship defense based on cost.  *Id.* ¶¶ 85, 289.  Although Defendants argue in their reply brief that Plaintiff would not be able to perform fluoroscopy in a remote setting, that claim is both untimely raised and thus appropriately disregarded, and insufficient on its own even if timely raised to entitle Defendants to summary judgment.  Defendants have pointed to no undisputed evidence that performance of fluoroscopy was essential to the job.  There is evidence that fluoroscopy constituted only 3% of Plaintiff's workload.  *Id.* ¶ 288.  The failure-to-accommodate claim thus must go to the jury.

### B.    Cooperative Dialogue

Defendants also argue that they are entitled to summary judgment on Plaintiff's claim that they failed to engage in a "cooperative dialogue" under NYCHRL.  Summary judgment on that claim is denied.

Under NYCHRL, "[i]t shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time."  N.Y.C. Admin. Code § 8-107(28)(a).  That process involves "good faith . . . written or oral dialogue concerning the

person's accommodation needs, potential accommodations that may address those needs, and the difficulties that such accommodations may pose for the covered entity." *Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102 (1st Dep't 2020) (quoting the Committee Report of in support of Local Law 59). "The failure to engage in a cooperative dialogue is independently actionable under the NYCHRL." *Goldman v. Sol Goldman Invs. LLC*, 2022 WL 6564021, at *5 (S.D.N.Y. Aug. 5, 2022), *report and recommendation adopted*, 2022 WL 4482296 (S.D.N.Y. Sept. 27, 2022); *see also id*. at *10 (describing such failure as a "*per se* violation" of NYCHRL).[28]  A "cooperative dialogue" must be undertaken in "good faith," *Hosking*, 126 N.Y.S.3d at 102.

Plaintiff characterizes Kantor as having "immediately rejected Heiden's request."  Dkt. No. 73 at 21.  The record, viewed in the light most favorable to Plaintiff, provides a basis for a reasonable jury to conclude that Kantor did so.  Kantor, in his initial forwarding of Plaintiff's accommodation request, stated that:

> Although [t]he system is acquiring a limited number of workstations for Radiologist to work from home, this is not going to be immediately available, and Dr. Heiden's skill set does not meet the criteria for the initial installations.  If you have a few moments today, I would like to speak to you concerning this request.

Dkt. No. 60-24.  No mention was made of Plaintiff's disability.  Kantor then testified that he "didn't think about the request" and he "read it briefly."  Dkt. No. 69-2 at 205.  In a subsequent conversation with Delts, Kantor stated that the "department is not able to provide any computer equipment or things that [Heiden] might need to access the system virtually, but . . . that they

---

[28] The parties' arguments concerning "interactive process" are otherwise not proper for consideration on summary judgment.  While the presence of an interactive process may be "introduced as evidence tending to show disability discrimination," there is no independent cause of action for the failure to engage in an "interactive process" under the ADA or NYSHRL, unlike the "cooperative dialogue" claim under NYCHRL.  *Sheng v. M & TBank Corp.*, 848 F.3d 78, 86 (2d Cir. 2017) (ADA); *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838, 11 N.E.3d 159, 169 (2014) (NYSHRL); *cf. Goldman* 2022 WL 6564021, at *5 (NYCHRL).

would coordinate them accessing the radiology read system virtually, but he could not provide any equipment that the employee would need to do so." Dkt. No. 69-9 at 19.  It is undisputed that there was no discussion with Plaintiff of his accommodation request between March 23 and March 26.  Kandel returned Plaintiff's forms on March 27 showing his medical need.  On March 30, 2020, Kantor told Ravenel that he was denying Heiden's request for accommodation because he "could not accommodate the request." Dkt. No. 72 ¶ 367.  Ravenel then subsequently told Plaintiff about the denial of his accommodation request.  *Id.* ¶ 370; Dkt. No. 69-4 at 35 (Ravenel testimony that he "spoke to Dr. Kantor before [he] reached out to Dr. Heiden" about his denial).  It is undisputed that Kantor had the authority to make the final decision on the accommodation.  Dkt. No. 69-4 at 24–25.  Throughout this process, no mention was made of Plaintiff's offer to pay for his own equipment.  The only relevant interactions with Plaintiff were his submission of the request, the submission of Plaintiff's forms, and Ravenel informing Plaintiff that they had denied his request.  There was otherwise no exchange with Plaintiff exhibiting a "cooperative dialogue," particularly concerning his disability, any "potential accommodations" or the "difficulties for the covered entit[y]." *Hosking*, 126 N.Y.S.3d at 102.[29]

---

[29] Defendants contend that it was "plaintiff's resignation that made this process end."  Dkt. No. 86 at 8.  That argument fails because there is evidence that Ravenel told Plaintiff that his request was denied on March 30, 2020, before the notice of resignation.

## CONCLUSION

The motion for summary judgment is GRANTED in part and DENIED in part.  The

motion to strike is DENIED.  The motion to seal is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 58, 62, 88.

SO ORDERED.

Dated: January 11, 2023
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge